KISCHMAN et al., Appellants, v. SCOTT et al.

Division Two, December 17, 1901.

1. **Will: PARTIES.** It is not error to force the plaintiffs, in a contest to set aside a will, to trial without compelling all persons who may be interested in the estate, though not named as devisees, to be made parties. (Distinguishing Wells v. Wells, 144 Mo. 198, and Watson v. Alderson, 146 Mo. 333.)

2. ———: ———: **CONTINUANCE.** At the time application for continuance was made, defendants had made a complaint of defect of parties and were insisting on a trial. Seventeen months had elapsed after the cause was for trial before this application was made. *Held,* that plaintiffs, whose duty it was to make all necessary parties to the action either plaintiffs or defendants, can not complain of their neglect to do so, and under the circumstances there was no such abuse of the discretion of the trial court in denying the continuance as would authorize an appellate court to interfere.

3. ———: **WITNESS: MARRIED WOMAN.** A married woman, as a general rule, is incompetent to testify in an action to which her husband is a party, and on an announcement by the court that she is incompetent for any purpose, counsel should state what it is that is proposed to be proved by her. Otherwise, the appellate court can not say that the matter concerning which it was proposed to have her testify was material, and if material whether she was competent to testify in regard to it or not.

4. **Will: UNDUE INFLUENCE: NO EVIDENCE: INSTRUCTION.** Where there is no evidence to support the charge of undue influence in a suit to set aside a will, no instruction should be given to the jury on that point.

Kischman v. Scott.

5. ———: ———: FOSTER CHILD: KINDNESS. The principal bene-
ficiary under the will had been the protege, since her infancy, of the
testator, who was never married. She was the child of his dead
sister, who left her to him to .raise, when she was two years old,
forty years before the making of the will. After she grew to be
large enough she lived in his house, and after her marriage, even
till his death, she remained with him, nursed him, cared for him
in his old age, and ministered to his wants as if she were· his
own child. *Held*, that no influence which grows out of such kind-
ness, unless some imposition or fraud is practiced, can be said to
be undue, however unequal may be her share in his estate, and
even though it may have induced the testator to make unequal
distribution.

6. ———: CAPACITY. One who understands what property he pos-
sesses, what disposition he is making of it, and all persons who
come reasonably within the range of his bounty, and is possessed
with sufficient understanding and intelligence to understand his
ordinary business, has sufficient capacity to make a will.

7. ———: ———: UNDERSTANDING LEGAL CLAUSES. It is necessary
that the testator should reasonably understand how his will is to
take effect before he can be said to have sufficient capacity to make
a will, but this does not mean that he shall understand the scope
and bearing of its provisions as prepared by his legal advisor.

8. ———: ———: CLEAR RECOLLECTION. It was not error to strike
out the word "clear" in an instruction which said the testator
should have had "a clear recollection of his property as well as the
natural relations of family and blood" at the time he made his will
else he was incapacitated.

9. Instructions: DEFINING WORDS IN. It is not error to fail to define
words in instructions which a jury of ordinary intelligence under-
stand, such as "fraud," "preponderance" and "presumption" as
used in instructions in a will contest. Besides, if appellant wants
such words defined he should ask the trial court to do it, and unless
he does he can not complain on appeal.

Appeal from Clay Circuit Court.—*Hon. E. J. Broaddus,*
Judge.

AFFIRMED.

*J. H. Bremermann* for appellant Kischman.

(1)    There is no principle better settled than that in a will contest all the heirs must be made parties.    Watson v. Alderson, 146 Mo. 333; Wells v. Wells, 144 Mo. 198.    (2) The court erred in refusing to permit the wife of plaintiff, Moritz Kischman, to testify in the cause as to what she had seen with her eyes at the bedside of the deceased on the morning when the pretended will was drawn.    When the fact of her being wife to Moritz Kischman appeared, the court sustained defendant's objection to her testifying, and when plaintiffs offered to show what they proposed to prove by her, his broad announcement, as taken down by the stenographer, was, "She is not competent to prove anything by, being the wife of the plaintiff, one of them,' and not a party to the suit herself, and is not competent for any purpose."    The court thus not only prevented her from telling the very thing we were trying to bring to the light of day, namely, what took place in the sick room that morning, but cut us off from the right to make a tender or offer of proof.    Shanklin v. McCracken, 140 Mo. 347; Jackson v. Hardin, 83 Mo. 175; Best v. Hoefner, 39 Mo. App. 682; Copp v. Hardy, 32 Mo. App. 588.

*Chas. H. Winston* for appellant Meitling.

(1)    In instruction 5, given for proponents, the court erred by failing to define or explain the term "fraud" and the term "otherwise executed and published," used in that instruction.    (2) Instruction 6, given for proponents, is inconsistent with instructions 3 and 1, given for contestants, and is incorrect in its definitions of testamentary capacity and execution of wills, and the court fails to define the term "fraud" therein used; and the instruction is wholly erroneous, and takes from the jury a part of the evidence and issues.    Farmer v. Farmer, 129 Mo. 530; Mueller v. St. L. H. Ass., 73 Mo. 242; s. c., 5 Mo. App. 399; Benoist v. Murrin, 58 Mo. 322; Carl v. Gabel, 120 Mo. 283; Young v. Ridenbaugh, 67 Mo. 588; Rig-

gin v. Westminster College, 160 Mo. 579. (3) Instruction 7, given for proponents, incorrectly defines testamentary capacity and incorrectly declares the law as to presumptions and erroneously fails to define the term "presumption" therein used, and takes from the jury an issue of fact and part of the evidence. State ex rel. v. Estel, 6 Mo. App. 10; Carl v. Gabel, 120 Mo. 297; Mueller v. St. L. H. Assn., supra; McFadin v. Catron, 120 Mo. 272; Gay v. Gillilan, 92 Mo. 264. (4) Instruction 13, given for proponents, is wrong in using the conjunctive "and" instead of the disjunctive "or" in its definition of undue influence, and in including "force" as a necessary element. Gay v. Gillilan, 92 Mo. 262; Carl v. Gabel, 120 Mo. 296. (5) Instruction 14, given for proponents, is wrong because it takes from the jury the evidence of actual, constructive and legal fraud not included in undue influence; and practically tells the jury to find for proponents unless contestants have proved undue influence by the preponderance of the evidence. Tibbe v. Kamp, 154 Mo. 545; Morton v. Heidorn, 135 Mo. 616. (6) Instruction 15, given for proponents, defines the preponderance of the "testimony," but does not define preponderance of the "evidence." It ought to have defined preponderance of the "evidence." 2 Bouvier's Law Dic., p. 589; 25 Am. and Eng. Enc. Law, p. 1019; Morton v. Heidorn, supra.

*Geo. F. Ballingal, H. F. Simrall* and *Wm. Moore* for respondents.

(1) The rule that all at interest must be made parties, is not an inflexible rule in practice. The exceptions to the rule, where the parties are beyond the jurisdiction of the court, non-residents of the country, too numerous, burthensome, inconvenient, impracticable, and expensive, control and dispense with the necessity of the rule, and the rule in chancery practice in such cases prevails. Lilly v. Tobbein, 103

Mo. 489; Bonnemort ex rel. v. Gill, 167 Mass. 338; Garvin's Admr. v. Williams, 50 Mo. 212; Bank v. Polk, 1 Del. Ch. 174; Woods v. Dummer, 3 Mason (U. S.), 317; Dugan v. Northcut, 7 District of Columbia App. 351; Williams v. Whinyates, 2 Broones Ch. Rep. 400; Bushong v. Taylor, 82 Mo. 670; Chasteen v. Ford, 5 Littell (Ky.), 269; Patton v. Allison, 7 Humphrey (Tenn.), 320; Hodges v. Baughman, 8 Yerg. (Tenn.) 186; Miller v. Foster, 76 Tex. 479. (2) (a) The German consul, Dr. F. Meier, had no legal status in the action, and could not be permitted to take an ambiguous attitude, either by himself or in behalf of persons he claimed to represent, by making special application only for continuance, without entering his appearance or the appearance of persons he claimed to represent as parties to the action, and take the consequences or stay out. Tower v. Moore, 52 Mo. 120; Dickerson v. Chrisman, 28 Mo. 141. (b) No evidence of representations made by German consul, as to heirs additional, or unknown parties, reputed to be represented by him, and no evidence appeared at the trial showing such persons named by him had actual existence. The representation so made, naming supposed heirs, alleged other unknown heirs, not named, thus attempting to block the trial of case for all time. (3) (a) The wife of a party to a suit is not a competent witness in his behalf, for general purposes, and to bring such witness within the rule of exception, she must be qualified to the specific fact, and the attention of the court must be specifically called to it, by setting forth the testimony expected to be proved, and the tender must show materiality and relevancy from the testimony set forth by the offer, so as to bring the witness within the rule of exception, before the court can be put in the wrong for its ruling. The omission to so express, and set forth the testimony can not shift the responsibility to the court. No general ruling the court makes, without such tender, will shift the responsibility from the offering party, for his failure in such omission. Hickman v. Green, 123 Mo.

179; Fitzgerald v. Barker, 96 Mo. 664; Jackson v. Hardin, 83 Mo. 187; Bagnell v. Chemical Bank, 76 Mo. App. 125; State to use v. Boettger, 39 Mo. App. 684; Watkins v. Edgar, 77 Mo. App. 154; Bank v. Durill, 61 Mo. App. 543; Bank of Commerce v. Cleveland, 64 Mo. App. 548.	(b) The reasonable inference deduced from the fact that no specific tender setting forth the testimony expected to be proved, was made and preserved in the record, is that it was valueless and had no probative force.	Sweet, Dempster & Co. v. Sullivan, 77 Mo. App. 134.

BURGESS, J.—This is a statutory contest of the will of J. M. Hager, deceased, late of Jackson county.	The venue was changed to Clay county on application of plaintiffs.	The will bears date June 29, 1896, and the testator died on January 24, 1897, at the advanced age of about seventy-six years. He left surviving him neither wife nor descendants.	The plaintiffs are descendants of the testator's deceased sister, Martha.	Defendant, Anne Lee Scott, is the only living child or descendant of his sister, Mrs. Levenger; Lilburn Scott is her husband and executor under the will.	Mary Meitling, who is named as defendant, but who was not served with summons and did not appear, was a daughter of said Martha.

James M. Hager was born in Germany, September 29, 1820, and with these two sisters migrated to America in A. D. 1841.	He became a resident of Jackson county in 1851.	In 1854 his two sisters, Martha and Mrs. Levenger, came from Baltimore, and Mrs. Levenger died in his house in 1856, leaving a son, who has since died, and her daughter Anna.	Mr. Hager's sister, Martha, had two children, Moritz and Mary Kischman, by her first husband, Kischman, and two children, Henry and Mary Meitling, by her second husband, Fritz Meitling.	Martha died in Mr. Hager's house in 1858.	Mary Meitling was afterwards taken into the family of a man named Gaither and has not been heard of for many years.	Mary

Kischman married and died, and her descendants are plaintiffs.

James M. Hager left three sisters in Germany when he migrated to America. They are also dead. His sister Anna Elizabeth left four children, who live in Germany. His sister, Catharine Elizabeth, left seven children, five of whom live in Germany and two in Baltimore, Maryland. His sister, Anna Katharina, left four children, who live in Germany. None of the sisters in Germany or their descendants was made a party to the suit, though their names and residences were shown to the court, and plaintiffs asked and were refused leave to join them as defendants before the trial began.

By the terms of the will the testator gave to his niece, Anna Lee Scott, one undivided one-half interest in all of his estate. The remaining undivided one-half interest in all of his real estate he gave to said Anna Lee Scott in trust, to be held by her during her natural life for his sisters, and if they were dead then to the children of such sisters, share and share alike.

The will provides: "It is expressly provided that Anna Lee Scott shall sell or dispose of the interest in this item provided for at her option or desire, and I authorize her to do so, and if disposed of during her natural life, then I desire her to invest the proceeds in other lands or safe securities and again be sold or re-invested at her option or desire, and to sell and dispose of such interest herein provided for upon such terms as she may deem best; said Anna Lee Scott to use and occupy said lands, or the proceeds herein provided, for paying the taxes thereon, and to make no account therefor, provided that at the option of said Anna Lee Scott she may disburse to the devisees the part or portion so devised at any time she may desire. And I will and bequeath to my sisters and their children, and the children of them, the part, portion and interest provided for herein, in the manner and at the time as above set forth in this item."

The will is assailed upon two grounds: First, want of mental capacity on the part of the testator to make a will; and, second, fraud and undue influence exercised by Anna Lee Scott in the procurement of its execution.

On June 16, 1898, by leave of court, plaintiffs filed an amended petition, wherein Lou Deidrich, a minor, by her curator, Frank Simpson, and Lora Belle Bennett, a minor, by her curator, Frank Simpson, and Frank Simpson, curator of the estate of said minors, were joined as co-plaintiffs with the other above-mentioned plaintiffs, and said defendants, Anna Lee Scott and Lilburn Scott, were named as defendants with "Mary Meitling, alias Mary Allen, alias Mary Gaither, and other unknown parties, unknown heirs of James M. Hager, deceased;" and thereupon summons to Mary Meitling, alias Mary Allen, alias Mary Gaither, issued to the sheriffs of Platte and Buchanan counties, respectively, and an order was made for publication of notice to her "and other unknown parties unknown heirs" of said deceased, and the cause was continued to the next term of said Clay Circuit Court. The summons to Platte county was returned *non est.* The summons to Buchanan county was never returned. The order of publication was duly published.

November 10, 1898, Dr. F. Meier, consul of the German Empire, specially appeared and filed in said cause an application for a continuance on behalf of certain citizens residing in said empire and named in said application as heirs of said deceased. This application was overruled and exceptions saved.

Plaintiffs thereupon, on November 14, 1898, filed a motion for leave to again amend their petition by joining said citizens of the German Empire, setting forth their names and their residence, as co-defendants in said action. This motion was overruled, November 14, 1898, and exception was duly saved.

November 17, 1898, at same term of court, Dr. F. Meier,

consul, presented his bill of exceptions, which was duly allowed, signed, sealed and filed in said cause and court.

·· The verdict was in favor of the proponents, Anna Lee Scott and Lilburn Scott; and within four days thereafter, and during the same term of said circuit court, plaintiffs filed their motion for a new trial, which was overruled March 11, 1899.

The salient facts, briefly stated, are about as follows: The testator, a native of Germany, together with two sisters, emigrated from that country to this in 1841. He became a resident of Jackson county in 1851. In 1854 his two sisters, Martha and Mrs. Levenger, came from Baltimore to Jackson county. Mrs. Levenger died in the testator's house in 1856 leaving a son, who thereafter and before the institution of this suit, died, and a daughter Anna. The testator's sister Martha had two children, Moritz and Mary Kischman, by her first husband, Kischman, and two children, Henry and Mary Meitling, by her second husband, Fritz Meitling. Martha died in Mr. Hager's house in 1858. Mary Meitling was afterwards taken into the family of a man named Gaither and has not been heard of for many years. Mary Kischman married and died and her descendants are plaintiffs.

James M. Hager left three sisters in Germany when he migrated to America. They are also dead. His sister, Anna Elizabeth, left four children, who live in Germany. His sister, Catharina Elizabeth, left seven children, five of whom live in Germany and two in Baltimore, Maryland. His sister, Anna Katharina, left four children, who live in Germany. He was born in Haubern, Germany, September 29, 1820. None of the sisters in Germany, or their descendants, was made a party to the suit.

The testator many years ago acquired the title to about eighty-four to ninety acres of land in Jackson county, worth at the time of his death on January 24, 1897, from two to three hundred dollars per acre, upon which he had resided for over twenty years with his niece, Anna Lee Scott, and her

husband, who occupied his house on the farm and with whom he lived. He also had notes on solvent persons amounting to something over eight hundred dollars including interest. He was not a strong man physically, and at the time of the execution of his will, like almost all men of his age, but not more so than usual, was feeble.

In June, 1896, he was suffering from a cold and on the twenty-second day of that month called a physician, Dr. Gardner, of Kansas City, who testified that he found him suffering from a severe cold, malaria and general debility incident to old age. That he did not regard him as a very sick man. That he visited him regularly for several days prescribing for him the usual treatment in such cases, such as stimulants, tonics, with an occasional hypodermic injection of strychnine to stimulate the heart's action. That on the morning of June 29, 1896, the day upon which the will was executed, he called to see him and found his physical condition better, and his mind entirely clear. Sometime previous to that time the testator had concluded to make his will and sent word to one of his neighbors, an old friend of many years standing, Mrs. Dittman, that he intended to do so, and wanted her to witness it, which she consented to do.

Anna Lee Scott's mother died when she was about two years of age, and the testator had the care of her from that time until she married, and went with her husband to Iowa to live, but they remained there only a little over a year when they returned to her uncle the testator's, and lived in his house with him from that time on until his death. The testator recovered from his illness with which he was afflicted at the time of the execution of the will, but in the winter of 1896 and 1897, he again contracted cold, from the effects of which he died as before stated. After he executed the will he was heard to say that he had made his will, was satisfied with it, and that he had done more for the plaintiff, Moritz Kischman, than he ought to have done.

From the time Mrs. Scott was large enough, except during the time she was in Iowa, she always looked after the comfort and health of her uncle, waiting upon and nursing him in sickness and ministering to his wants.

The four witnesses to the will all testified that his understanding was clear at the time of its execution, that he knew what he was doing, knew all about his surroundings—what property he owned, and asked some of them especially to witness it. Their testimony was corroborated, in so far as the condition of the testator's mind was concerned about the time of the execution of the will, by at least eight or nine other witnesses.

Plaintiffs, however, introduced evidence which showed that about the time of the execution of the will, but prior thereto, the executor was very feeble in both body and mind, would not transact business without the assistance of Mrs. Scott or her husband, was forgetful, and contentious, at one time had his coat on wrong side out, and devoted considerable time to catching drift logs and brush, with which he attempted to riprap the bank of a creek which runs through the farm, and old empty tin cans, some of which he piled up like children at play.

It is said that the court erred in forcing plaintiffs to trial without compelling all persons interested in the estate to be made parties and Wells v. Wells, 144 Mo. 198, is relied upon as sustaining that contention. The point ruled in that case was that in a suit to set aside a will which names devisees who are not made parties, the judgment will be reversed, even though the point of defect of parties was first raised in this court. But no such defect of parties exists in the case at bar, for the devisee named in the will in contest is made party defendant.

Watson v. Alderson, 146 Mo. 333, is another authority relied upon by defendant, but it also is not, we think, in point. It only passes upon the question as to who may contest a will,

and there is no such question involved in this case.   Nor do we know of any law by which any person can be made a party plaintiff against his will to a suit to contest a will, or which makes it a condition precedent to the right of any person interested in the estate, in the event the will be set aside, to prosecute a suit for that purpose, that all other persons alike interested be made parties plaintiff in such suits.   Such a rule would often defeat the ends of justice, for in many instances all the parties interested could not be found or their consent could not be obtained for that purpose, and to meet such condition our statute (sec. 544, R. S. 1899) provides that "if the consent of any one who should be joined as plaintiff can not be obtained, he may be made a defendant, the reason thereof being stated in the petition.   This section shall apply to both actions at law and suits in equity."

The defendants were making no objection to proceeding with the case upon the ground of defect of parties but were insisting upon a trial.   The action was for trial at the April term, 1897, of the circuit court of Jackson county, but was not tried until the November term, 1898, of the circuit court of Clay county, seventeen months having elapsed from the time at which it stood for trial, which was much longer time than was necessary to get all the necessary parties in court, and certainly plaintiffs, whose duty it was to make all necessary parties either plaintiffs or defendants in the action, can not complain of their own neglect to do so.   Moreover, the matter of continuance rested largely in the discretion of the court, which was not, we think, unwisely exercised, and it is only in case it was so exercised that this court will interfere. There was therefore no error in overruling the application for a continuance.

It is also said that the court erred in refusing to permit Arvilla Kischman, the wife of plaintiff, Moritz Kischman, to testify as a witness in the cause.   It appears from the record

that when Mrs. Kischman was introduced as a witness, and testified that she was the wife of the plaintiff, Kischman, the defendants objected to her testifying upon the ground of incompetency.    The objection was sustained, the court ruling that being the wife of the plaintiff she was incompetent as a witness for any purpose.

Plaintiffs' counsel then remarked that "the plaintiffs offered to prove by this witness in behalf of the other parties to this suit," when the court again observed that she was not competent for any purpose.    But the matter was not pressed, nor was the offer made to show that Mrs. Kischman, if permitted to do so, would testify to any material fact, or with respect to any matter, to which she was competent to testify. As a general rule a married woman is incompetent to testify in an action to which her husband is a party, and if there were matters with respect to which Mrs. Kischman was competent to testify, it should have, in fairness to the court, been so stated, and as this was not done we are unable to say whether it was material, and if so, whether she was competent to testify to it or not.    [Hickman v. Green, 123 Mo. 165; Bank v. Durrill, 61 Mo. App. 543; Watkins v. Edgar, 77 Mo. App. 148.]

At the instance of the plaintiffs, the court gave six instructions, refused four, and modified one, the third, and then gave it as modified.

At the instance of defendants, the court gave fifteen instructions all of which, except the first five, are criticised by plaintiffs.

With respect to those given as asked, it would serve no useful purpose to consider them severally, for while some of those given in behalf of the defendants are subject to verbal criticism, when taken in connection with plaintiffs' they presented the case, very fairly to the jury—more favorable to plaintiffs, however, than they had a right to ask or expect, and especially with respect to the charge that the will was obtained

by undue influence, which was entirely without evidence to support it, and that question should never have been submitted to the jury.  Mrs. Scott had been the protege of the testator, who was wifeless and childless, since her infancy; she was the child of a dead sister, who left her to her uncle to raise, when she was only about two years old.  After she grew to be large enough she lived in his house, nursed him, cared for him and ministered to his wants as if she were his own child.  As was said in note to Small v. Small, 16 Am. Dec. 259: "Influence gained by kindness and affection will not be regarded as undue, if no imposition or fraud be practiced, even though it induced the testator to make an unequal and unjust disposition 'of his property in favor of those who have contributed to his comfort and ministered to his wants, if such disposition is voluntarily made." [In Re Gleespin's Will, 26 N. J. Eq. 523.] Again, in Mackall v. Mackall, 135 U. S. 167, it is said: "It would be a great reproach to the law if, in its jealous watchfulness over the freedom of testamentary disposition, it would deprive age and infirmity of the kindly ministrations of affection, or of the power of rewarding those who bestow them." [Campbell v. Carlisle, 162 Mo. 634.]  Nor were there any such relations existing between the testator and the devisees in the will as to cast upon the latter the burden of showing that the will was executed without undue influence upon her part.

As to the testamentary capacity of the testator to make the will, the evidence shows beyond any question that at the time of its execution he was in full possession of his mental faculties, and understood the business about which he was engaged, what property he possessed, what disposition he was making of it, and all the persons who come reasonably within the range of his bounty, and was possessed with sufficient understanding and intelligence to understand his ordinary business, and was beyond any question competent to make a will (Couch v. Gentry, 113 Mo. 248), and this, too, although he

may not have been capable of making a contract or managing his estate. [Brinkman v. Rueggesick, 71 Mo. 556; Maddox v. Maddox, 114 Mo. 35.] And while it is true that the testator should have reasonably understood as to how he desired his will to take effect, it was not necessary that he should have understood the scope and bearing of the provisions of the will as prepared by his legal advisor. [Couch v. Gentry, 113 Mo. 248.]

The third instruction, as asked by plaintiffs, reads as follows:

"The jury are instructed that testamentary capacity, or possession of sufficient mind to make his will, is like the capacity to attend to his own affairs, if his bodily health would permit his attention to them; and no man who is incompetent mentally to transact his ordinary business can be pronounced capable of making his will. It is also necessary that the testator should have a clear recollection of his property as well as the natural relations of family and blood; and if he did not himself write the will, or read it, that the same should have been read and explained to him so as to be fully understood and comprehended by him."

The court refused to give this instruction as asked, but modified it by striking out the word "clear" before the word "recollection," and then gave it as modified, and in refusing it as asked, plaintiffs insist error was committed. It was held in Kirchner v. Collins, 152 Mo. 394, that the use of such a word in an instruction should be avoided, and this being so no error was committed in striking it from the instruction as asked, and then giving it as modified. [McBride v. Banguss, 65 Tex. 174; Adams v. Eddy, 29 S. W. Rep. 180; Cabell v. Menczer, 35 S. W. Rep. 206.]

It is insisted that the court erred in failing to define the term "fraud" as used in the defendants' fifth instruction, and in failing to define the term "presumption" as used in defendants' seventh instruction, and also in failing to define the

term "preponderance" as used in the defendants' seventeenth instruction. But there is no merit in these contentions, because, they are all terms that are generally well understood, and the jurymen who sat in judgment upon the trial of this case must be accorded at least ordinary intelligence and understanding, and to define by an instruction terms so simple would have been a reflection upon their intelligence. Besides, if plaintiffs had desired the terms defined they should have asked an instruction to that effect, and having failed to do so will not now be heard to complain.

There was no error in refusing instructions asked by plaintiff, as those that were given presented every phase of the case to the jury.

The judgment was for the right party and should not be disturbed. All concur.