Ray FREEMAN, Ethel Freeman, and John C. Kappel, Jr. (Plaintiffs), Appellants,

v.

Gertrude Ament DE HART et al. (Defendants), Respondents.

No. 29750.

St. Louis Court of Appeals.

Missouri.

June 14, 1957.

Motion for Rehearing or to Transfer to Supreme Court Denied July 1, 1957.

Kappel & Neill, Walter S. Berkman, Lester W. Spilker, St. Louis, for appellants.

Edwin A. Smith, St. Louis, for respondents.

ANDERSON, Judge.

This is a proceeding to contest the will of Adele M. Scholl, deceased. Contestants, Ray and Ethel Freeman, are legatees named in a prior will. Contestant John C. Kappel, Jr., is named as executor in said prior will, with power to distribute the residuary estate to various charities of his own selection. The proponents of the will moved to dismiss the petition and cause of action on the ground that the contestants were not proper parties under Section 468.580 RSMo 1949, V.A.M.S. c. 475 Appendix. On March 19, 1956, the court sustained this motion as to John C. Kappel, Jr., but overruled same as to the Freemans. The trial resulted in a finding by the jury that the writing in question was the last will of the deceased, and judgment was entered accordingly. John C. Kappel, Jr., has appealed from the order and judgment of March 19, 1956; and the Freemans, together with John C.

Kappel, Jr., have appealed from the judgment on the verdict. The appeals were to the Supreme Court. Subsequently, the Supreme Court, on the ground that it was without jurisdiction, transferred said causes to this court. The separate appeals have been consolidated here for hearing.

Appellants' first point is that the jurisdiction of this appeal is in the Supreme Court for the reason that the amount in dispute is in excess of $7,500. Appellants urge that we so hold and that the case be retransferred to the Supreme Court.

The will in question was executed on September 17, 1954. By its terms eighteen specific bequests were made to individuals and various charitable institutions. The residue of the estate was left to certain relatives. Ethel Freeman was bequeathed the dining room furniture together with the china set and dishes belonging to testatrix. No bequest was made to Ray Freeman. Dorothy Greulich was named executrix. Edwin A. Smith was nominated executor in the event Dorothy Greulich was unable or unwilling to act as executrix.

The prior will was executed on May 19, 1954, and proved in the Probate Court within a year from the date of the death of testatrix. By its terms, Ethel Freeman was bequeathed the dining room furniture together with the china set and dishes belonging to the testatrix. She and her husband, Ray Freeman, were, by Article III of said will, given the sum of $1,000. The other specific bequests were the same as in the will of September 17, 1954, except that in the later will bequests to the Shriners' Hospital and the Little Sisters of the Poor were increased from $1,000 each to $2,000 each. By the residuary clause it was provided that the rest, residue and remainder of the estate was devised and bequeathed "to such charities and charitable organizations as my hereinafter named executor shall select and determine in such proportions and amounts as he shall in his sole discretion deem advisable,

and I hereby direct that he shall designate the recipients thereof during the administration of my estate in writing filed with the Probate Court in which my estate is administered, * * *." John C. Kappel, Jr., was nominated as executor.

Appellate jurisdiction in this case turns on the amount in dispute between the parties. That amount must be determined by ascertaining the value in money of the relief to plaintiff, or of the loss to defendant, should the relief be granted, or, vice versa, should the relief be denied. Higgins v. Smith, 346 Mo. 1044, 144 S.W. 2d 149.

It is urged by appellants that the record shows the loss to the parties given the residuary estate would be in excess of $7,500 should their contest be upheld. They say that the record shows the estate as valued at $59,397.72; that the specific legacies amount to $20,500; that all expenses of the estate have been paid; and that the amount of pending claims, three in number, amount to $15,820.50, leaving a net value of the residue at $23,077.22.

That part of the record which appellants claim substantiates their calculation appears in the transcript as follows:

"Mr. Berkman: Your Honor, please, at this time I want to read a portion of proponents Exhibit B, which is the official court file in the estate of Adele Scholl.

"The Court: All right.

"Mr. Berkman: This file shows, gentlemen of the jury, that as of September 28, 1955, a statement was filed in which Mr. Smith took an acknowledgment showing that the value of this estate as of that date was $59,-397.72. That is, all the bills against the estate, except claims of Percy Bryant and the Freemans, have been paid.

"Mr. Smith: I object to that. That has nothing to do with this lawsuit

It is wholly irrelevant and immaterial to the issues in this case.

\* \* \* \* \* \*

"The Court: What is the purpose of this?

"Mr. Berkman: I have to establish jurisdiction, your Honor.

"Mr. Smith: The amount establishes jurisdiction?

"Mr. Berkman: No, it doesn't. For instance, it is a jurisdiction question. It has got to appear prima faciely.

\* \* \* \* \* \*

"The Court: The Court will take jurisdiction. There is nothing there for jurisdiction. Let's not get into matters like that."

■ The effect of the court's ruling when he said: "Let's not get into matters like that," was to exclude the paper which appellants' counsel was attempting to introduce. Therefore there is no evidence in the record showing the value of the assets of the estate, and without such evidence there is no way to determine the value of the residuary estate—the amount in dispute. But, even if the paper, whatever it was, did get into evidence, and assuming that it showed that all bills and claims had been paid as of its date, September 28, 1955, it does not affirmatively show that all the claims against the estate were in at the time, since the time for filing claims had not expired. For aught that appears, claims against the estate subsequently exhibited may have reduced the net value of the residuary estate to less than $7,500. In our judgment, the record fails to affirmatively show that the amount in dispute in this case is in excess of $7,500. Whitworth v. Monahan's Estate, 339 Mo. 1123, 100 S.W.2d 460; Bostian v. Milens, 354 Mo. 153, 188 S.W.2d 945; Nies v. Stone, Mo.Sup., 108 S.W.2d 349; Smith v. Oliver, Mo.Sup., 148 S.W.2d 795; In re Ellis' Estate, Mo.Sup., 127 S.W.2d 441; Aurien v. Security Nat. Bank Savings & Trust Co. of St. Louis, Mo.Sup., 129 S.W.2d 1047.

■ At the threshold of the case we are confronted with the question as to whether we have jurisdiction of John C. Kappel, Jr.'s appeal from the order and judgment of March 19, 1956. The copy of the notice of appeal, sent to the Supreme Court pursuant to the provisions of Section 512.070 RSMo 1949, V.A.M.S., recites that the appeal is from the order and judgment entered on the 19th of March, 1956. It is dated September 5, 1956. The order and judgment of March 19, 1956, was the one sustaining, as to plaintiff John C. Kappel, Jr., defendants' motion to dismiss on the ground that he was not a proper party plaintiff under the provisions of Section 468.580 RSMo 1949, V.A.M.S. c. 475 Appendix. This order had the force and effect of finally disposing of the cause as to John C. Kappel, Jr., and was appealable. Bruun v. Katz Drug Co., Mo.Sup., 211 S.W.2d 918; Hoefer v. Wease, Mo.App., 104 S.W.2d 721; Beechwood v. Joplin-Pittsburg R. Co., 173 Mo.App. 371, 158 S.W. 868, 871. In the latter case a trustee in bankruptcy was substituted for the plaintiff in his action for personal injuries. Plaintiff appealed from said order, and it was urged by respondent that the appeal was premature. This contention was not allowed. The court pointed out that the order appealed from had the effect of adjudging that the title of the plaintiff's cause of action rested in the trustee, and that plaintiff no longer had any interest in the same, and that consequently it was a final disposal of the case so far as the original plaintiff was concerned. The court also placed emphasis on the fact that the plaintiff was completely severed from the cause of action and hence could not appeal at any later stage, so that his appeal was not premature. The court said:

"The effect then of the order in question was the same as the dismissal of the case as to plaintiff, and the institution of a new suit by the trustee.

It was a final disposal of the case so far as this plaintiff is concerned. * * * It has been frequently held that an appeal will lie from an order or judgment completely disposing of any collateral matter on the ground that the court's jurisdiction has been exhausted as to the matter decided. * * *

"It is true that it has frequently been ruled that a judgment is not final, so as to be appealable, unless the judgment disposes of all the parties to an action, and that there cannot be but one final judgment in a case. [Citing cases.] It will be found, however, in all these cases that the plaintiff still remained as a party to the cause, and that there was some matter left undetermined between him and some defendant, and that the appeal was merely premature; the right of appeal remaining in plaintiff at some later stage of the case. In this case, however, plaintiff is completely severed from the cause of action—it is no longer his but another's—and he cannot appeal at any later stage. His appeal is not premature. Whatever steps may be taken further in this matter are not taken in plaintiff's case, but in the case of I. N. Threlkeld, trustee, against the defendant."

As heretofore stated, the order and judgment appealed from was entered March 19, 1956. No motion to set aside, or motion for rehearing, was filed by plaintiff John C. Kappel, Jr. Therefore, the order and judgment became final, for the purpose of appeal, thirty days after its entry, to wit, April 18, 1956. Supreme Court Rule 3.24, 42 V.A.M.S. The notice of appeal was filed on September 5, 1956. Section 512.050 RSMo 1949, V.A.M.S., provides that: "No such appeal shall be effective unless the notice of appeal shall be filed not later than ten days after the judgment or order appealed from becomes final." In this state of the record, the appeal based on the notice filed September 5, 1956, was untimely and did not confer jurisdiction on this court to determine the said appeal.

■ In the transcript there appears another notice of appeal, filed on September 5, 1956. As originally written by the reporter it purports to be an appeal by Ray Freeman and Ethel Freeman from the verdict and judgment entered on June 14, 1956, which became final upon the over-ruling of the Freemans' motion for new trial on September 4, 1956. By interlineation the name of John C. Kappel, Jr., is added in the notice, as it appears in the transcript, as one of the parties appealing from said final judgment. Even if we consider John C. Kappel, Jr., as a party to this notice by reason of this interlineation, we must still hold that it did not confer jurisdiction on this court to consider an appeal by him. At that time he was out of the case and had no right of appeal from the final judgment. Beechwood v. Joplin-Pittsburg R. Co., 173 Mo.App. 371, 158 S.W. 868.

■ Section 512.020, RSMo 1949, V.A.M.S., relating to appeals, among other things, provides that any party to a suit to be entitled to appeal must be "aggrieved" by the judgment in the action from which the appeal is taken. He must not only be a party, but must have an interest in the subject matter of the suit in order to be aggrieved by the judgment. Shock v. Berry, 221 Mo.App. 718, 285 S.W. 122; O'Connell v. Dockery, Mo.App., 102 S.W. 2d 748; State ex rel. Fischer v. Vories, 333 Mo. 197, 62 S.W.2d 457. In a will contest, it must be a direct pecuniary interest in the result of the litigation. State ex rel. Fischer v. Vories, supra.

■ It has been held that an executor or administrator has no direct pecuniary interest in the subject matter of a will contest such as to make him an "aggrieved party" within the meaning of Section 512.020, supra. Shock v. Berry,

supra; O'Connell v. Dockery, supra; Love v. White, 348 Mo. 640, 154 S.W.2d 759. The same rule should apply to an executor named in a prior will. The only benefit accruing to him from a successful contest of the later will would be the right to serve as executor, if the prior will stood, and to receive such commissions as might be allowed to him. This right is not a beneficial interest in the estate passing to him under the will, but compensation allowed by law under orders of the Probate Court. Helfrich v. Yockel, 143 Md. 371, 122 A. 360, 31 A.L.R. 323. Nor does the executor named in a prior will represent the beneficiaries therein for the purpose of attacking the validity of the subsequent will. In re Ballard's Estate, 362 Mo. 1150, 247 S.W.2d 683. Clearly, an executor named in a prior will, as such, has no interest in the subject matter as to make him an "aggrieved party" within the meaning of § 512.020 of our statute, which allows an appeal only to a party "aggrieved" by the judgment.

█ Nor does the fact that John C. Kappel, Jr., was given power to dispose of the residuary estate make him an aggrieved party. The power of appointment is a deputation of the donee to act for the donor in disposing of the donor's property. It is not a property right or a pecuniary interest in the estate, but a personal privilege or duty imposed upon the donee of such power. Pope v. Safe Deposit & Trust Co., 163 Md. 239, 161 A. 404; Forbes v. Snow, 245 Mass. 85, 140 N.E. 418.

It follows that the appeals of John C. Kappel, Jr., from the order of March 19, 1956, and from the final judgment of June 14, 1956, should be and are accordingly dismissed.

█ The Freemans also contend that the trial court erred in sustaining the motion to dismiss as to John C. Kappel, Jr. We will not lend an ear to such complaint. The Freemans were not injured by the ruling. Our statute, Section 512.160, subd.

2, RSMo 1949, V.A.M.S., forbids this court to "reverse any judgment, unless it believes that error was committed by the trial court against the appellant, and materially affecting the merits of the action." This proposition is so fundamental that it needs no authority for support. But aside from this technical objection, there is no merit in the point. It appears that all persons named as devisees and legatees in the will in question were joined as defendants. Under such circumstances, assuming that Kappel was a person interested in the estate, it was not necessary, under the decisions, that he be joined as a party plaintiff. Ehrlich v. Mittelberg, 299 Mo. 284, 252 S.W. 671; Kischman v. Scott, 166 Mo. 214, 65 S.W. 1031.

The validity of the will in question was assailed on the ground that testatrix was not possessed of a sound mind at the time the will was made. The will was executed on September 17, 1954, while she was in the hospital during her last illness. She entered the hospital on August 10, 1954. Testatrix died November 5, 1954. Eight lay witnesses for proponents testified that in their opinion testatrix was of sound mind at or about the time she signed the will. Six lay witnesses testifying for contestants gave contrary opinions.

Dr. Robert Nussbaum, the attending physician, first saw testatrix at her home on August 10, 1954. On that date he examined her and then sent her to the Lutheran Hospital. At that time Mrs. Scholl was extremely feeble and very pale. She answered questions in a hesitant and befuddled manner and could give no actual history of her illness. She could not get out of bed without assistance.

After testatrix was removed to the hospital Dr. Nussbaum saw her daily, and examined her on various occasions. In the hospital admission note there appears the following: "The patient or the relatives are unable to give any reliable or consistent history information; suggestions that the patient has been ill for several weeks

* * * with lethargy, and weakness, and has been treated by a chiropractor—a colored physician, with medicine and shots. Patient has, apparently, been in no pain; has had no bleeding, or vomiting. She does very little, and wants only to be left alone to die. * * * Physical examination reveals an elderly female lying supine with no evident distress. She is hard of hearing, and markedly apathetic. When we distend skin, the mucuous membranes are colorless. No general glandular enlargement. There are several small ecchymotic areas on her left arm and lower extremities. Her head is normal. Her face is puffy and white. Her eyes are normal except for intense pallor and some edema of eyelids. Nose and throat were normal except for marked pallor * * *." In said record there is the following entry, dated September 11, 1954: "The patient is not responding satisfactorily to specific pernicious anemia therapy. The blood count drops without transfusion. She had progressed from mental torpor to euphoria. And now she has organized delusional patterns of true paranoia. Her outlook is very poor."

The doctor explained that paranoia was a mental illness manifested by symptoms of persecution. She felt she was being persecuted. She was unable to communicate in any intelligent way. She was confused to the point of not knowing where she was, or being able to identify any of the people around her. She further expressed fears that people were trying to harm her; that the medical attendants and the nurses were plotting against her; and that someone had actually started a fire in the corner of the room during the night. The doctor further testified that after September 11, 1954, she became less manic and less disturbed, but lapsed into a state of total apathy and unresponsiveness. He noticed no improvement in her general condition. He stated that in his opinion "the evidences that this patient revealed were those of an individual of unsound mind. * * *

"Q. Was that her condition on the 11th? A. Yes.

"Q. Was that her condition thereafter? A. In my opinion, it was, thereafter. She showed no evidence of rationality.

"Q. Then, on the 17th, would your opinion be still she was of unsound mind? * * * A. In my opinion, yes."

On cross-examination, the witness testified that his main diagnosis was anemia, and that was what he was treating her for. He stated that it was possible for a person in the condition she was in to have lucid intervals. He further stated that, in his opinion, on the 17th of September she did not know she was signing her last will and testatment. She died of cancer of the lower bowel, which was the cause of her anemia.

It further appears from the evidence that on August 9, 1954, Mrs. Scholl executed the necessary papers appointing John C. Greulich as her deputy in connection with her safe deposit box at the Lindell Trust Company. At that time Mr. Harry Graef, who was Vice-President and Treasurer of the trust company, told Mr. Greulich that he would not be permitted to enter the box until he furnished a statement from Mrs. Scholl's physician as to her mental capacity. Thereafter, on August 27, 1954, Dr. Nussbaum wrote the following letter to the Lindell Trust Company:

"This is to certify Mrs. Adele Scholl is physically and mentally capable of appointing her deputy of personal affairs."

This letter was introduced into evidence by proponents as their Exhibit I, and by contestants as their Exhibit 2.

On January 7, 1956, Dr. Nussbaum wrote the following letter to Mr. Edwin A. Smith, counsel for proponents:

"I have carefully reviewed the hospital records of Amelia (sic) Scholl and

have refreshed my memory concerning the last weeks of her illness.

"I can state unequivocally that on September 1, 1954, she began to show a progressive physical decline and unrelenting downhill course that terminated in her death on November 5, 1954. However, she maintained her mental faculties until September 21, 1954, when she began to show periods of severe weakness and mental torpor. These episodes became more frequent and persistent until October 30, 1954, when she became stuporous and, after another four days, she slipped into a terminal coma.

"I trust this information will serve to clarify the problem."
This letter was introduced into evidence as proponents' Exhibit J, and contestants' Exhibit 3.

On January 9, 1956, Dr. Nussbaum wrote the following letter to Mr. Edwin A. Smith:

"This letter countermands my communication of January 7, 1956.

"The information given in that letter did not include a notation written by me in Mrs. Scholl's chart on September 11, 1954, brought to my attention by the Records Librarian at Lutheran Hospital this morning. Somehow, in reviewing Mrs. Scholl's chart, I overlooked this entry.

"Now, in summary, I am able to state that Mrs. Scholl's progressive physical decline began about September 1, 1954, and continued its downhill course until her death on November 5, 1954. On September 11, 1954, there was a change in her lethargic and depressed condition to one of euphoria and mental excitement.

"On that date she revealed signs of confusion and disorientation and spoke irrationally. She did not recognize her medical attendants and referred to incidents of persecutory nature.

For instance she had the idea that there was a fire in her room during the night and that the nurses were plotting against her. Following this, she remained uncommunicative although she was quiet and cooperative and showed no further evidences of further mental deterioration until September 21, 1954, when she began to have periods of severe weakness and mental torpor. These episodes became more frequent and persistent until October 30, 1954, when she developed stupor and, after another four days, she slipped into a terminal coma."

This letter was introduced into evidence as contestants' Exhibit 4.

The records of the Lutheran Hospital with reference to Mrs. Scholl's illness were introduced into evidence by contestants. As to this, the transcript shows:

"Mr. Berkman: At this time I want to offer into evidence as in contestants' case the following exhibits, and I request leave to pass them to the jury so they can inspect them, and read them, and everything else. We will start with the hospital records, which is contestants' Exhibit 1. To save time, I want to read to the jury those parts that I feel are very pertinent, and pass this to them * * *.

*     *     *     *     *     *
"The Court: * * * You may read any portion, and counsel for the proponents of the will may read any portion. * * * I don't think anything should be introduced there after the making of this will.

"Mr. Berkman: That's right. * * * I will stop right before the will. * * * And I had no intention to go any further.

"The Court: * * * I want that understood.

"Mr. Berkman: That is understood, your Honor."

Counsel for contestants then read from the hospital record the entries theretofore read to the jury by Dr. Nussbaum and, in addition, the entries to the effect that testatrix was, on September 9, 10, 13, and 14, confused and disoriented.

After the jury had deliberated on their verdict for several hours they sent a memorandum to the judge requesting the hospital records through September 17th and the two letters written by Dr. Nussbaum to Mr. Smith, dated January 7, 1956, and January 9, 1956. This memorandum was shown to counsel for both proponents and contestants. According to a statement dictated into the record by the trial judge, at a hearing on the motion for new trial, counsel for the proponents objected to sending these exhibits into the jury room, while Mr. Berkman, counsel for the contestants, contended that the judge should comply with the jury's request. Mr. Berkman, in a statement made at said hearing, stated that neither counsel objected to the jury having these documents. The court then decided that, notwithstanding Mr. Smith's objection, he would send the requested exhibits to the jury room. The hospital records in their entirety and the two letters were then delivered to the jury room by the deputy sheriff. Counsel for contestants made no objection at the time, nor did he request an instruction admonishing the jury not to examine or consider those entries made subsequent to September 17th. Counsel for proponents then requested that the letter of August 27, 1954, should be given to the jury. Mr. Berkman, counsel for contestants, then said: "Judge, you shouldn't send that exhibit up, because the jury didn't request it, but if you want to send it up, you should send all the exhibits up." The judge then decided that since the letter of August 27th was written near the date of the execution of the will, and had been offered in evidence by both proponents and contestants, it should be sent to the jury. He then gave it to the deputy sheriff who took it to the jury room.

Appellants urge that the court erred in sending the hospital records to the jury room in their entirety without obscuring or deleting the parts not admitted in evidence. They urge that they were prejudiced by reason of the fact that in the bedside notes made subsequent to September 17th there were entries stating that testatrix was rational at times. The first of such entries appears under the date of September 20th. There were also entries made subsequent to September 17th to the effect that testatrix was on certain days confused, disoriented and lethargic. After examining all these entries we find it difficult to believe that appellants were prejudiced by the court's action. In our judgment the record merely reveals that testatrix's mental condition subsequent to September 17th was about the same as it was on and immediately prior to that date. Furthermore, it would appear that the claim of prejudice comes as an afterthought. The transcript shows that the record entries subsequent to September 17th were excluded—not on any objection of contestants, but by the court of its own initiative, thus indicating that appellants at the time did not consider them prejudicial. It also appears that the court's action in sending the entire record to the jury room was with the knowledge, and without any objection, of appellants' counsel. The first objection made was in appellants' motion for new trial. An objection after verdict comes too late. Parties who remain silent in such instances must be presumed to have consented to the action of the court. Zeibold v. Foster, 118 Mo. 349, 24 S.W. 155.

Appellants' final contention is that the verdict and judgment should be set aside and a new trial granted because the court sent to the jury room the letter of Dr. Nussbaum dated August 27, 1954. This letter had been introduced and read into evidence by both sides to this lawsuit. It related to the same matter as the two other letters which had been given the jury, that is, Dr. Nussbaum's estimate

of the mental condition of the testatrix. The record shows that counsel for contestants had urged the court to comply with the jury's request to send the January letters to the jury room. Those letters when read together were extremely favorable to contestants' cause. They showed that Dr. Nussbaum was of the opinion that the start of Mrs. Scholl's mental decline was on September 11. The letter of August 27, 1954, stated that Mrs. Scholl was on August 27th mentally capable of appointing a deputy in relation to her personal affairs.

Appellants urge that it was reversible error to deliver to the jury the letter of August 27, 1954, for the reason that it singled out and unduly emphasized the value of evidence favorable to proponents, and was tantamount to advice to them to return a verdict upholding the will.

Whether or not this letter of August 27, 1954, should have been put into the hands of the jury rested in the sound discretion of the court. A ruling based upon such discretion will not be disturbed on appeal unless it clearly appears there was an abuse of discretion. R. C. Stone Milling Co. v. McWilliams, 121 Mo.App. 319, 98 S.W. 828. We do not find abuse of discretion in the present case. Appellants at no time contended that Mrs. Scholl was of unsound mind prior to September, 1954. Their evidence all tended to show that her mental illness developed during that month. Appellants' counsel, in interrogating his witnesses, limited his inquiry with reference to Mrs. Scholl's mental condition to the month of September, 1954. He himself offered in evidence the letter of August 27th, thus indicating that he did not consider evidence showing a sound mind at that time as prejudicial to his case, and we do not, under the circumstances, believe that it was. In addition, we might add that it would seem that considerations of fairness should move the court to allow all the written evidence bearing on a

given point to be sent to the jury when it permits a part of such evidence to be delivered to the jury room. At least, the trial court should not be convicted of abuse of discretion in so doing.

Finding no error in the record, the judgment is affirmed.

RUDDY, P. J., and MATTHES, J., concur.