(No. 12334.—Decree affirmed.)
JOHN MORIARITY, Appellant, *vs.* MARY PALMER *et al.* Appellees.

*Opinion filed December 18, 1918.*

1. WILLS—*when court does not err in taking question of undue influence from jury.* If there is nothing in the evidence even tending to show undue influence by the beneficiary in the will, it is proper for the court to instruct the jury that such question need not be considered by them except to answer "no" to the special interrogatory propounding the question whether the will was procured by undue influence.

2. SAME—*what does not tend to raise an inference of undue influence.* The fact that a son whom the testator in his will expressly disinherits for the stated reason that he has received his share in expenditures by the testator on his account was not sent for when the will was made does not tend to raise an inference of undue influence, where the will was made in Illinois and the son resided in Montana.

3. SAME—*when offered proof is properly rejected.* In a proceeding to contest a will which devised all the testator's property to his daughter and expressly excluded the testator's son, an offer to prove that the daughter, in response to a statement by the son, after the funeral, that he wanted to talk to her about settling the estate, said that there really wasn't much to settle,—that the father had left everything to her,—is properly rejected.

4. SAME—*contestant not a competent witness to prove occurrences in testator's lifetime.* The complainant in a bill to contest a will is not a competent witness to prove matters which occurred during the lifetime of the testator.

· 5. SAME—*when finding that testator had testamentary capacity will be upheld.* If the evidence shows that the testator was of sound mind and capable of making a will at the time it was made, a finding that he had testamentary capacity will be upheld even though the evidence for the contestant, if taken alone, might raise an inference of want of testamentary capacity two years or more · before the will was made.

6. SAME—*what does not disqualify person from making a will.* The fact that a man is accustomed to drinking a great deal of intoxicating liquor does not disqualify him from making a will if the effect thereof was not operative when the will was made.

APPEAL from the Circuit Court of Lee county; the Hon. OSCAR E. HEARD, Judge, presiding.

CLYDE SMITH, (WALKER & GURLEY, of counsel,) for appellant.

JOHN J. ARMSTRONG, and H. A. BROOKS, for appellees.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

Sylvester Moriarity executed his last will and testament on June 23, 1914, and died on March 28, 1917, leaving his son, John Moriarity, and his daughter, Mary Palmer, his only heirs-at-law. His estate consisted of land in South Dakota, a silver watch and some clothing. By the will he gave all his property, real and personal, to his daughter, Mary Palmer, and appointed her executrix, and stated in the will that inasmuch as he had already paid debts incurred by his son, John Moriarity, and given him considerable money, he purposely omitted him from participating in any of the provisions of the will. The will was admitted to probate in the county court of Lee county, and the appellant, John Moriarity, filed his bill in this case in the circuit court of that county to set aside the probate of the will, charging a want of testamentary capacity and the exercise of undue influence by the appellees, Mary Palmer and Curtis Palmer, her husband, who were made defendants.

286 — 7

Issues were made up and submitted to a jury, which returned a verdict that the writing was the last will and testament of the deceased, and answered a special interrogatory whether the testator was of sound mind and memory with the answer "Yes," and the further question whether the instrument was produced by undue influence with the answer "No." A decree was entered accordingly and this appeal was prosecuted.

On the submission of the issue to the jury the court gave an instruction that there was no evidence of undue influence and directed the jury not to consider that question except to answer the interrogatory "No." The will was made and executed under the following conditions: The testator lived with his daughter in the city of Dixon and word was sent to an attorney that the testator wanted to see him. The attorney called at the house and was introduced to the testator, and they were left alone together in the dining room and had considerable conversation. The testator told the attorney how he wanted his will drawn and that he wanted to leave all his property to his daughter. He was asked if he had any other children, and said that he had a son, John Moriarity, and explained that he wanted to leave him out for the reason that he had paid considerable money for him and considered that he had had his share, and wanted that stated in the will. The attorney told him it was necessary to have two witnesses and desirable to have witnesses who knew him, and he said that he would get Jim Allen, the barber who shaved him and in whose shop he had been a great deal, and to have some one get Roy Davis, a wood-worker in the Grand Detour Plow Works. The witnesses were notified and the will was prepared. The next day the attorney went to the house and talked with the testator fifteen or twenty minutes before the witnesses arrived. Testator could not read or write and the will was read and explained to him, and particularly as to not giving his son, John, any share. The

will was executed with all necessary formalities, and there was no one present in the room while the attorney was there but a door was open to the kitchen, where the daughter, Mary Palmer, was. The son lived at Toston, Montana, at a great distance in a western State, and there was no reason for sending for him, so that his absence created no inference of undue influence. There was nothing to create a suspicion of undue influence, which must go to the extent of depriving a testator of his free agency and be directly connected with the execution of the will and be operative when it is made. (*Wicks* v. *Walden*, 228 Ill. 56; *Snell* v. *Weldon*, 239 id. 279; *Hurd* v. *Reed*, 260 id. 154.) The court did not err in instructing the jury that there was no evidence of undue influence.

The testator lived with his son, John, at Armour, South Dakota, in 1911 and until June 7, 1912, when he went to Dixon and lived with his daughter until his death. Witnesses for the complainant gave testimony tending to prove a want of mental capacity while the testator lived at Armour, South Dakota. A doctor who attended him at that time and fitted him with a truss for a hernia testified that he had the appearance of old age; that he had gray hair, faded and wrinkled skin, a ring of degeneration of the periphery of the cornea, hardened and tortuous arteries and organic heart trouble; that all these things were marks of old age and showed a breaking down of the physical and mental powers, and that the condition was permanent and progressive. The testator was near eighty years old, and undoubtedly that condition, with the usual attendants, was permanent and progressive. There were other witnesses who knew the testator at Armour who testified that he amused himself by playing a jews-harp in saloons, and would also gather a crowd about him on the street while he played his jews-harp. He was an Irishman, and in saloons he would sing "The Wearing of the Green," and played his jews-harp and danced. Sometimes he would be

playing his jews-harp on the street with his hat in his hand, swinging it around, and say, "Come on boys; lets go and have a drink." He would line up the crowd at the bar and dance and sing and fail to take his change until the bartender would call his attention to it. He was in the habit of drinking intoxicants and was careless and indifferent about the change when he got liquor at the bar or paid a bill. He was an expert with his jews-harp and enjoyed singing Irish songs and dancing, with which he entertained himself, generally under the excitement of liquor. He drank so much that when he invited the sheriff into a saloon to take a drink the bar-tender would not sell him a drink because he was on the blacklist, but he was usually supplied at the saloons although the bar-tenders would frequently refuse to sell him because he had had enough. The sheriff testified that he took the testator home, and when they got to the house testator asked him if he did not live there, and at other places he would say, "Let's stop; we must be home." There was evidence that the testator would stand by himself in the street and pay no attention to what was said to him; that he would suddenly leave off what he was talking about and start to talk about something else; that on one occasion he went out in the country to find his farm and could not find it, together with some other similar indications of failing mental powers. There were some witnesses who knew him at Armour who regarded him as of sound mind. The fact that he took pride in his ability to play the jews-harp and enjoyed singing Irish ballads and dancing was not a sign of insanity. Drinking whisky did not disqualify him from making a will if the effect was not operative when the will was made.

The evidence for the complainant, taken by itself, might raise an inference of testamentary incapacity two years or more before the will was made and that the same condition would continue, but the evidence as to his mental condition from June 9, 1912, until shortly before his death was

very satisfactory that during that time he was of sound mind and capable of making a will. That was the judgment of the attorney at the time the will was made and of the subscribing witnesses, who were well acquainted with him and who had good opportunities to know his condition. The complainant acted as his agent and attorney in fact, which was inconsistent with any claim of a want of capacity. On November 13, 1916, the complainant came to Dixon and went to the office of a justice of the peace with a mortgage for $6000 on the property of the testator purporting to be signed by the testator with his mark, and he took a doctor with him and explained the reason for making the mortgage without the knowledge of his father. He and the doctor induced the justice to take an acknowledgment of the mortgage certifying that the testator appeared before him in person, on the representation of the doctor that the testator was in such physical condition, owing to dropsy and a cardiac trouble, that the slightest shock might produce instant death. The testator was a large man, weighing 180 to 190 pounds, and had been a strong man, but at that time, which was long after the will was made, he had reached the condition described by the doctor. There was no representation then as to his ability to do business but only as to his physical condition, which at that time had become very bad. The evidence established pretty clearly that the testator was mentally capable of making the will.

The complainant was offered as a witness to prove the handwriting of letters directed to him by an agent managing the property at Armour and the signature of the county treasurer and the fact that his father never gave him anything, all of which related to occurrences during the lifetime of the testator. He was not a competent witness, under our statute, to prove any of those things. He was competent to testify to things which took place after the testator's death, and there was an offer to prove a conversation with the husband, Curtis Palmer, in reference to the

preparation of the will. He did not know that it was in the presence of the defendant Mary Palmer and it was not competent. He was also offered to prove a conversation with Mary Palmer after the funeral, in which he said that he wanted to see about settling the estate before he went home, and she replied, "There really isn't very much to settle; father has given everything to me." Her statement had no tendency to prove undue influence or any issue in the case, and rejection of the offer by the court was proper.

The complainant offered an instruction that there was no evidence that the testator paid debts of the complainant or made gifts to him, and the court modified it so as to say there was no evidence whether or not the testator paid debts of the complainant or made gifts to him. There was no evidence one way or the other. The testimony of witnesses who knew nothing about such facts and did not profess to know had no tendency to prove whether or not the facts existed.

The decree is affirmed.                    *Decree affirmed.*