Argued January 15; affirmed February 26, 1935

## In re Knutson's Will

## RUDE et al. *v.* KNUDSON

(41 P. (2d) 793)

*George C. Johnson,* of Portland (Johnson & Mathews and M. B. Meacham, all of Portland, on the brief), for appellants.

*F. C. Howell,* of Portland (Wilbur, Beckett, Howell & Oppenheimer, of Portland, on the brief), for respondent.

ROSSMAN, J. Uncontradicted evidence indicates the following: Anton Knutson, with whose estate we are now concerned, died in Portland on April 9, 1932, aged 72 years. October 17, 1931, while he was lying ill in a hospital in Portland, he signed the will which the contestants attack. Surviving Knutson, who was a bachelor, are his brother Ole, a resident of the state of North Dakota, his brother Knud, a resident of the state of Washington, the latter's daughter Thelma, who is a defendant and proponent in this proceeding, and the eight children of Anton's deceased sister Mary, contestants in this proceeding. Thelma is a spinster, 37 years of age, and is sole beneficiary of the aforementioned will. The ages of the contestants range from 25 to 45 years. The deceased's estate was appraised as worth $33,810.27. In September, 1929, he submitted to surgical treatment for a hernia, and in February, 1931, he submitted to similar treatment for a disorder of the bladder. He again entered the hospital September 17, 1931, this time on account of gall stones in the urethra. On October 8, 1931, an operation was performed.

Omitting mention of averments which are immaterial to the issues before us, the petition alleges that at the time Anton signed the will he "was not of sound or disposing mind or memory" and was "mentally incapable and incompetent to make said pretended will". For a second ground of contest, the petition avers that at the time he signed the will, and for some days prior thereto, Anton "was in an extremely weakened condition of both mind and body"; that the defendant, being aware of that fact, and knowing that she would take nothing from the deceased's estate except through her father's one-third thereof, unless she could influence Anton to designate her as the bene-

ficiary of his will, "did deliberately plan, determine and set about to procure the execution of the will making her the sole beneficiary of the decedent's estate by ingratiating herself into decedent's confidence through flattery, lavish attentions and pretended affection for him, and by making such false and fraudulent representations to decedent concerning your petitioners as would impair, disrupt and destroy the cordial and affectionate relations she knew to be then existing between decedent and your petitioners, and enable her to gain dominance and control over decedent's mind and subjugate his will to her own". Continuing, it alleges that on October 9, 1931, the defendant learned that Anton was seriously ill, that she hurried to the Portland hospital where he was confined, that, upon arriving, she "did again immediately take full charge and control at Portland Sanatarium of decedent's person and business and until his death she directed him and dictated to him in his business and personal affairs and acted as his confidential agent therein". The petition alleges that she continued "her said sham pretense of disinterested affection and concern for decedent and did continue her said false and fraudulent representations concerning your petitioners". It charges that she thereupon demanded that Anton execute a will making her his sole beneficiary, and that she employed J. B. Pfouts, an attorney, to prepare the will. Contestants further allege that the defendant brought her father, the aforementioned Knud Knudson, to assist her in her scheme; that after the father arrived he, Thelma and the attorney "did importune, demand and insist that decedent execute" the will at once. In this manner, the petition alleges, the will was executed. The answer denies all of the averments aforementioned, and alleges that when the will was executed Anton was

of sound mind and not under restraint or the improper influence of any person.

The transcript of testimony consists of 450 pages and is accompanied by 39 exhibits, consisting, for the most part, of letters. We have read and studied this evidence with care. We deem it unnecessary to set forth a complete review of it. It indicates that Anton came to Portland 40 years or so ago, and at once established himself in the grocery business in the vicinity of 39th and Belmont streets in a building of which he acquired ownership. Sometime before his death he disposed of his business, but retained ownership of the real property. Anton made his home in an apartment over the store, and was still living at 39th and Belmont streets at the time of his death. As time passed he acquired other property at 39th and Belmont streets and improved one of his lots with a substantial structure. Early residents of this neighborhood who had known Anton for many years described him as a strongminded man who kept his business affairs to himself and who was never known to have changed his mind. Each declared, however, that he possessed a clear, keen mind.

Anton began to manifest fondness for the defendant when she was a very young girl and his attachment for her continued until the time of his death. When she was not living in Portland he frequently sent for her, had her visit him at his apartment, and in various ways showed her the attentions that are bestowed by an affectionate uncle upon a niece. Later, she became a schoolteacher and was for a time located at Forest Grove. At that time Anton would drive to Forest Grove in his automobile at the week-end and bring Thelma to his home. Frequently he was accompanied by a friend. Sunday evening he and his friend would

return Thelma to Forest Grove. While visiting in his apartment she assisted him with his household duties and also coached him in the studies which he was pursuing preparatory to acquiring citizenship. When Thelma left Forest Grove for a better position with the schools of Everett, Washington, the two exchanged correspondence and at times Thelma came to Portland to visit Anton. Occasionally the two went upon fishing trips and other outings. The contestants make no contention that at this period of time Thelma was actuated by any motives except wholesome, natural ones. Anton's affection for Thelma is revealed in many letters as well as by the testimony of many of his old-time friends. The latter described the pleasure that he apparently felt in introducing Thelma as his niece and the satisfaction that he obtained through knowledge that she was a schoolteacher. C. C. Nepple, who had known Anton for 22 years, testified that the latter frequently spoke of Thelma, stating at times, "She is the only girl I have got." A. B. Nelson had known Anton for 30 years, and Thelma for about 20 years. He had accompanied them many times on the rides to and from Forest Grove. According to him, Anton, in referring to Thelma and her father, would declare, "That is all the relations I have now, Mr. Knudson and Thelma." Mrs. Marie McKenna, who had been a friend and customer of Anton since 1907, testified that Anton was very fond of referring to the defendant as "the girl". The neighborhood barber, who had known Anton for 17 years, testified that the latter always spoke "very commendably" of Thelma, frequently expressing himself as pleased "with the way she was taking care of him". John Eder, a friend for over 30 years, and who had been on fishing trips with Anton, testified that he "talked of her (Thelma) a lot of

times''. He added: ''He was always telling me how proud he was of his niece, that she was a smart girl and very industrious and economical, conservative, and he thought a lot of her.'' Mrs. Mollie Dahl, who had known Anton for more than 50 years, testified: ''He always wanted to speak of her (Thelma) every time I would see him, and whenever he did it was in very endearing terms.'' William Ferris, whose farm adjoined one owned by Anton, testified that the latter frequently spoke to him about his niece, stating: ''I think a whole lot of her.'' His wife testified to like effect. The superintendent of the postal station at 39th and Belmont streets, who knew Anton for 13 years, testified: ''He seemed to be very closely attached to her (Thelma), about the only one that he took any real interest in. She was here during his entire illness, and whenever he became ill, he used to tell me, he said, 'I'll have to send for the girl.' '' Mrs. Amanda Tench, with whom Anton boarded at one time, testified that he spoke of Thelma as ''a mighty fine girl''. Her husband gave like testimony. This testimony is not contradicted, and the credibility of these witnesses is not attacked.

Anton's sister Mary was married to an individual named Rude. To them 10 children were born, eight of whom survive. The family came to Portland in 1910. While the children were young they exchanged visits with Anton, but later all of the eight children, with the exception of one, married, and to the seven thus married children were born. Mary died in 1927. Her husband, the contestants' father, died in 1916. We believe that the testimony indicates that after Mary's sons and daughters were married their interest in Anton declined as it became engrossed in those at home. No friction, however, developed between Anton

and these eight nephews and nieces. The relationship between him and them is indicated quite clearly, however, by the fact that many of his old-time friends were wholly unaware of the fact that he had any relatives except Thelma. One or two of them testified that they knew he had a brother, and three or four of the witnesses testified that at the end they became acquainted with some of the contestants.

The relationship between Anton and Thelma is further indicated by the fact that he talked to her occasionally about his store buildings, referring to this property at times as "ours". Twice he borrowed money from her with which to improve his property, later repaying the sums with interest. His attitude towards Thelma is further indicated by some of the testimony to which we shall now refer. To his friend Nepple he declared that in his will "everything shall go to her" (Thelma). To Nelson he referred to Thelma as being his only relative, and said that he would leave her everything, adding, "She is capable enough to take care of it." He told Mrs. McKenna that "when he passed away, that when he was gone, that Thelma— that 'the girl' would be well fixed; that everything that he had was hers". Eder testified concerning some of the Forest Grove trips: "Coming back, he would speak of her and he said that if something should happen to him that he wanted her to have everything he had." Mrs. Dahl testified that Anton told her: " 'If there is anything left after me, when I am gone, and she (Thelma) outlives me', he says, 'I want her to have it all.' " Ferris testified that Anton told him that he had no one except Thelma to give his estate to, and "he was going to give it to Thelma". His wife testified that Anton had told her: " 'If she (Thelma) lives longer than me all my property goes to her.' " In

1927 Anton wrote to the defendant: "Say, so many times as I have given you hints about you would become the beneficiary of my estate if I should pass away before you. You know why I thought so. Just because I have thought so much of you." On one or two occasions he spoke to Thelma concerning mutual wills, proposing that each make one in behalf of the other.

We shall now review briefly the testimony which indicates whether or not Anton possessed testamentary capacity on October 17, 1931, the day when he signed the will. He entered the hospital September 17, 1931; the operation was performed October 8, 1931; he left the hospital January 4, 1932, and some days later was back upon his feet, again attending to the routine of his business. March 13, 1932, his steady improvement ceased and from then on until the time of his death, April 9, 1932, he was confined to his bed. The day before the operation Thelma received a letter at Everett, Washington, from Anton, urging her to come to Portland. About the same time she received a long distance telephone message from one of Anton's friends telling her of his illness. She arrived at the hospital the day following the operation. In compliance with Anton's request, she remained in his room on a cot every night for about a month's time. Thelma was not a nurse, but the evidence indicates that he derived comfort from her presence. According to Thelma, her uncle's mind was clear during his confinement in the hospital, with the exception of times when the opiates made him drowsy. She testified, however, that he was strong-willed, and any delay in complying with his requests made him highly irritable. In the summer of 1931 some one had instituted a personal injury action against Anton, and he had employed J. B. Pfouts, an attorney, to represent

him. According to Pfouts, in the conferences between himself and his client, the latter mentioned the property which he owned, and expressed an intention to leave all of it to Thelma. He also spoke of mutual wills. While Anton was in the hospital it developed that the claim could be settled upon the payment of $500, and October 13 or 14 Pfouts called upon Anton at the hospital, giving him this information. Anton was agreeable to a settlement, handed to Thelma a key to his safety deposit box, and told her to take from it $500 and deliver it to Pfouts. This was done. October 16, eight days after the operation, Pfouts, pursuant to a request, again called upon Anton. In the course of an hour's visit, Anton directed him to prepare the will with which we are now concerned. Thelma was present. Anton, according to Pfouts, stated the names and approximate ages of his relatives. These Pfouts wrote upon a sheet of paper which he presented at the trial. Pfouts swore that Anton asked for mutual wills, stating that he desired to leave everything to Thelma, and that she would devise her estate to him. According to this witness, Anton "told me that none of these relatives had ever done anything for him except Thelma, and that is the reason he was going to give her his property". According to Pfouts, and to Thelma, she took virtually no part in this conference. Pfouts swore that Anton's mind was "absolutely sound". The following day Pfouts returned with the wills. Besides Anton, Pfouts and Thelma, there were present in the room Knud, his wife, and S. Glasscock, husband of one of the contestants. Mrs. Knudson and Glasscock, however, retired to the hall shortly after Pfouts entered. Pfouts testified that upon this visit Anton's mind was clear and "he knew exactly what he was doing". Pfouts produced the two wills, read them aloud, handed them to Anton

and he then perused them. Pfouts testified that after Anton had expressed satisfaction with the wills he (Pfouts) explained that it would be necessary to have some one besides himself sign as a subscribing witness. Anton suggested Ralph W. Nelson, superintendent of the hospital, with whom he had become acquainted during his three confinements there. Edgar M. Smith, Anton's nurse, then summoned Nelson. When Smith, who had nursed Anton during his three confinements at the hospital, was asked concerning Anton's mental condition on October 17, he replied: ''He seemed to be all right.'' Nelson, referring to Anton, testified: ''Mr. Knutson introduced me to his brother and told me he was there from up in Washington somewhere, and we just visited back and forth.'' When asked the condition of Anton's mental faculties, he replied: ''It seemed to me that he was normal. I didn't detect anything out of the ordinary. * * * I think he was just as clear mentally then as he was at any other time that I had ever met him.'' After Nelson arrived, the nurse left the room and the wills were signed. Nelson then left. According to Pfouts and Thelma, Anton then complained about the heavy hospital expenses, and stated that he held some notes which were past due and which he desired collected. He asked Pfouts to collect them, explaining in detail the financial circumstances of the debtors. Pfouts, upon being handed the notes, told Anton that Thelma could collect them and thereby save expense. His suggestion was adopted and he thereupon left. Dr. William Holden, who performed this operation, which he described as of a serious character, and who visited Anton twice a day thereafter, testified that, although Anton was physically weak, ''he knew what he was about'' and ''his mind was sound''. As we have seen, both Knud and his

wife were at the hospital on October 17. Knud, referring to the condition of Anton's mind in October, testified: "His mind seemed to be clear." Mrs. Knudson testified that on the evening of October 17 "he (Anton) was a sick man, but to my best knowledge and belief his mind was clear". Knud's description of what transpired on October 17 was in substantial accord with Thelma's and Pfouts' testimony. Apparently neither the illness from which Anton was suffering nor the nature of the operation exerted any effect upon the mental faculties, except in so far as physical weakness and the occasional administration of opiates affect the mind.

The aforementioned postal superintendent testified that he visited Anton twice a week at the hospital, and declared: "I conversed with him, and his mind was very clear. I didn't see anything unusual about it." Nepple testified that while Anton was at the hospital he twice telephoned to Nepple. A telephone was beside Anton's bed. In one of the calls he asked Nepple to attend to a roof leak, and in the other to a furnace adjustment. Concerning Anton's mental condition, the witness swore: "He was apparently all right; he looked to me all right." Mrs. McKenna received a telephone call from Anton October 9 while he was at the hospital, and, pursuant to his request, visited him there several times. Concerning his mental condition while at the hospital, she testified: "I would say he was a very bright man in every way, so far as I could see; I saw nothing wrong with him, and I was very well acquainted with him because he was in our home lots of times and had dinners with us and * * *." The aforementioned barber testified that he shaved Anton every other day while he was at the hospital. Concerning Anton's mental condition, he swore: "Most of the

time while I was up there, he seemed to be just the same as I always found him, no change, only sometimes he was in pain from his illness, but outside of that, rational.'' Eder testified that he visited Anton at the hospital twice a week and thus described his mental condition: ''His mind always seemed to be very clear; he seemed to have very strong vitality; and his mind was very good and clear.''

The only testimony offered by the contestants upon the subject of testamentary capacity came from themselves and from Mrs. Knud Knudson. They also depend upon entries made upon Anton's hospital chart. We shall now give a brief review of this evidence. One of the contestants, who visited Anton at the hospital two or three times a week, testified that four days after the operation ''he (Anton) was fairly well''. Two days later ''he was kind of dozey'' and didn't ''talk very much''. He answered in the affirmative a question which inquired whether he noticed anything about Anton in October that made him believe that ''he was not quite clear'' and explained his answer by saying: ''He was so kind of drowsy, sort of always complaining about his knee and his arms.'' He further testified: ''Sometimes he would talk quite a bit, and sometimes he would not talk so much.'' Another of the contestants testified that the day following the operation Anton ''was in a weakened condition'' and could talk in ''just a whisper''. She next visited her uncle eight days after the operation and described his condition thus: ''I thought he was a very sick man'' and declared that he couldn't talk. She next visited him upon his return to his home and swore that at that time he didn't recollect her two visits to the hospital. Another of the contestants visited Anton five or six days after the operation. At that time an injection of

intravenous glucose was being administered to him. Witnesses testified that glucose was administered when the patient was very ill and that its effect was to greatly increase his vitality. This contestant declared at that time "he was very, very ill. I really didn't expect to see him again". She said he did not care to talk and did not seem to want any one around him, although she and her sister remained for a half or three-quarters of an hour. Mrs. Glasscock, one of the contestants, who was a graduate nurse, 41 years of age, visited Anton at the hospital in the evening of the day of the operation. She testified: "I just went up to his bed and shook hands with him. He seemed pleased to see me, because he didn't know I was in town, and I asked him how he felt, and he says, 'pretty good' and I says,—I didn't want to disturb him because I knew he was tired and needed rest after his operation." She next visited him a few days later when he was awakening from a sleep. She could not recall the conversation, but testified that "he was a very sick man". Her next visit was at the time when the glucose was being administered to him. She testified that he was then "very drowsy and sleepy and he would just raise his eyes, although he grabbed my hand when I came in and squeezed it very hard". She testified, however, that when the nurse failed to return after the glucose needle was nearly empty, "Uncle turned around to me and he says, 'Can't you pull it out Kristine?' I says, 'Yes, Uncle, but' I says, 'I don't like to do it as long as there is nurses here on the floor.' 'Well' he says, 'you pull it out anyway'." Mrs. Glasscock visited Anton at the hospital upon many occasions, but did not testify that his mind lacked clearness. She stated, however, that he sometimes failed to complete his sentences, "just like he was too tired to go on with

the sentence''. She thought that throughout October he was weak. In December she nursed Anton two days during Thelma's absence, and testified: ''Uncle at that time had brightened up some and was feeling a good deal better.'' Mr. Glasscock testified that he visited Anton at the hospital frequently. When asked concerning his condition on October 8, 9 and 10, he replied: ''He was very low, in a very serious condition, was my opinion of it, and apparently all the rest of the time that I saw him. * * * He didn't seem to carry on much conversation of any kind. * * * He wanted to be quiet; he didn't want to be disturbed or to be bothered.'' Glasscock, referring to an occasion when he was in Anton's room for three or four hours, stated: ''During that time he would lie there like he was asleep, and would talk about 'poor Jim Hill, he had to die too', and things like that, so I came to the conclusion that he was delirious or dreaming.'' He also testified: ''I have been there when he wanted to go home. He wanted to get out of that bed. He said he was in the wrong bed; he wanted to get in his own bed.'' The above, we believe, constitutes a fair resume, brief though it is, of the oral testimony indicating Anton's condition about October 17.

An entry made upon the hospital chart in the latter part of October states: ''Patient seems irrational.'' An occasional other entry is to like effect. An entry on October 16 states: ''Niece says patient does not seem quite so clear in his mind tonight.'' The nurse testified that this entry was not in his handwriting, and Thelma swore that she never made such a statement. In October opiates were occasionally administered to Anton and the evidence indicates that they would cause him to become drowsy for short periods of time.

On five occasions in the period between October 17, when the will was signed, and April 9, 1932, when the testator died, he mentioned the will to others in a way that indicated that he fully knew what he did on October 17. Knud testified that on October 18, "he (Anton) was resting easy, and we talked things over and he mentioned the will, and he was glad that it was over with, that it was done, because he had been thinking of it for some time". Pfouts, after the visit of October 17, did not see Anton again until Christmas day. At that time nothing was said about the will, but after Anton had returned to his home in January, Pfouts visited him there once. According to him, "he (Anton) mentioned to me that word had come to him from some source—I have forgotten who he told me had told him—some of his friends had told him that some of these nieces and nephews stated that they had heard he made a will, and that they intended to break that will, and I asked Mr. Knutson if he wanted to change that will—it was always his privilege to change it if he saw fit to do so, and I would be glad to make a change in the will if he wanted to change it in any way. He said no, he did not want to change it, that was the way he always intended it to go, it was all right; he did not want to change it". Pfouts never saw him again. Nepple visited Anton in January, 1932, at which time Anton, according to Nepple, said: "I made a will; everything shall go to her (Thelma) anyway." Eder testified: "I was up there shortly after he made his will, and he told me that he had made his will. 'Well,' I says, 'is everything satisfactory?' 'Yes,' he says, 'You know, I always wanted her to have everything.' " The witness further testified: "After he got home I was up there one day, and he was unusually bright; he was up and around, and in the conversation I asked him

whether he thought his financial affairs was in good shape, and his will was all right, and he says, 'Yes,' and he was satisfied that it was all right; and he said he had it examined by more than one lawyer and they all pronounced it all right." Eder thus explained the reason for his inquiry: "I thought I would mention it to him, so that if he wasn't satisfied with it, that was a good time to make it over."

In support of their contentions that the testator lacked testamentary capacity when the will was made, and that he had been imposed upon, the contestants direct attention to the following items of testimony: During the last two weeks of Anton's life Thelma invited Mrs. Glasscock, who, as we have seen, was a graduate nurse, to nurse Anton. During the last four days of Anton's life Mrs. Kristina Zwick, a resident of California, who had known Anton for many years, came to Portland and remained at the bedside. According to Mrs. Glasscock, on one occasion in the four-day period just mentioned, "he (Anton) grabbed my hand —he grabbed my hand, and he said, 'Oh, it's too late; it's too late.' I said, 'What is too late, Uncle?' He says, 'To make things right; to make things right.' " The same witness testified that in this four-day period she heard Anton say to Mrs. Zwick, "Tear up those papers." We quote further from her testimony: "Well, he was in one of his wild rages then too; he says, 'Don't quarrel over my money; there is enough for everybody.' " We now quote from Mrs. Zwick's testimony: "He asked me, 'Are you married?' and I said, 'No; if I had been married I wouldn't have come here.' And then he said, 'They told me; she told me.' * * * He said one evening or one night that I was with him, he says, 'They made me do it. Tear up the papers; tear up the papers.' Well, I didn't know what to say.

I said, 'Calm yourself; don't be excited;' and I tried to talk to him, you know, about that he should be calm, but he seemed to be very anxious about having me do something like that, tear up the papers, and I couldn't quite understand, so then I went in to Thelma." The witness inferred that Anton had reference to a will when he spoke of "the papers", but at that time some paper napkins had been tucked around his neck because he was drooling from his mouth, and evidence indicates that he might have had reference to those napkins. Those who were present during Anton's last two weeks agreed that he was very ill, that he was constantly under the influence of opiates, and that he experienced great difficulty in expressing himself. In his last four days he was very weak and frequently raved. The witnesses who saw him in these last four days used the word "coma" often in describing his condition.

■ It is well established in this state that when the testamentary capacity of a testator, whose will has been probated in common form, is attacked by direct proceedings, the proponent must re-probate the instrument in solemn form, and in so doing must assume the burden of proving that the decedent possessed testamentary capacity. Thus, the burden of proving that Anton possessed testamentary capacity on October 17, 1931, is upon Thelma.

■ From *In Re Will of Robert Carr*, 121 Or. 574 (256 P. 390), we quote:

"It is quite well settled in this state as to testamentary capacity that if a testator, at the time he executes his last will, understands the business in which he is engaged and has a knowledge of his property and how he wishes to dispose of it among those entitled to his bounty, he shows sufficient testamentary capacity, notwithstanding he may be advanced in age, sick, debilitated in body or in extreme distress."

This definition of testamentary capacity suffices for our present needs.

█ If Pfouts told the truth, and we believe that he did, the testator knew on October 17, 1931, those who naturally had a claim upon his bounty, because he told Pfouts the names and approximate ages of all of his relatives. There is substantial evidence that he also knew the disposition he desired to make of his estate. For instance, he had mentioned on previous occasions mutual wills, the plan which he actually employed, and he had often expressed an intention to leave everything to Thelma. Since Thelma possessed very little and was 35 years his junior, possibly the idea of mutual wills was not sensible. It may be that it was purely whimsical, but it is not essential to the validity of a will that a testator makes one which the courts or the community deem sensible. Besides the opinions of the witnesses, we have evidence of a material character which indicates that the testator was mentally capable of making a will. For instance, a few days before he signed the will he settled a damage action by authorizing payment of the sum of $500. On two subsequent occasions he telephoned to Nepple concerning roof repairs and a furnace adjustment. Immediately after signing the will he directed the collection of some promissory notes. The fact that he fully comprehended the provisions of the will is indicated by the circumstance that during the five and one-half months that followed its execution he mentioned his will on five occasions, each time expressing satisfaction with the document. It is true that Anton was ill and physically weak when he made his will; but, as in all instances where discretion and judgment are the essential factors, the important item is the strength of the mind, and not that

of the body. We are clearly satisfied that Anton possessed testamentary capacity October 17, 1931.

We shall now dispose of the rest of the contentions presented by the contestants. They contend that (1) a confidential relationship existed between the testator and the beneficiary; (2) that she induced him to sign the will and exercised undue influence in so doing; and (3) that she practiced deception upon him by simulating affection for him and by falsely representing that the contestants had no interest in him.

■ The burden of proof on the issue of undue influence rests upon the contestants: *Wayne v. Huber,* 134 Or. 464 (291 P. 356, 294 P. 590, 79 A. L. R. 1427); *Talbert v. Skilbred,* 125 Or. 545 (267 P. 396); *Re Estate of Moore,* 114 Or. 444 (236 P. 265); *In Re Will of Robert Carr,* 121 Or. 574 (256 P. 390). The contestants concede that they have the burden of proof upon the issues we are now considering, but claim that they are aided by a presumption that undue influence was actually exercised. At this juncture we deem it helpful to quote the following from *In Re Dale's Estate,* 92 Or. 57 (179 P. 274):

"In considering the question as to whether or not undue influence has been exerted in a particular case, one is naturally led, first, to inquire into the opportunities which the person accused of this species of fraud, had to exert such control over the intention of the testator. Among these is the existence of confidential relations between the testator and the person so charged. While the existence of such a relation will not of itself, according to the weight of authority, create a presumption of undue influence, it is a circumstance which, taken in connection with other suspicious circumstances, may justify such an inference of undue influence as to put upon a beneficiary the burden of showing, by at least equal evidence and in many jurisdictions, by the preponderance of evidence,

that no such influence was exerted. Activity in the preparation of a will, which inures to the benefit or enrichment of the person accused, or members of his family, is one of these circumstances.''

From *Turner's Will*, 51 Or. 1 (93 P. 461), we quote:

''A mere confidential relation existing between the testator and a beneficiary under a will, or the opportunity of such beneficiary to exercise undue influence over the testator, is not enough to avoid a will. The fraud or undue influence that will suffice to set aside a will, 'must be such as to overcome the free volition or conscious judgment of the testator, and to substitute the wicked purpose of another instead, and must be the efficient cause, without which the obnoxious disposition would not have been made.' Holman's Will, 42 Or. 345-358, 70 P. 908. Or, as put by Mr. Justice Moore, In Re Darst's Will, 34 Or. 58-65, 54 P. 947, 'Influence arising from gratitude, affection or esteem is not undue, nor can it become such unless it destroys the free agency of the testator at the time the instrument is executed, and shows that the disposition which he attempted to make of his property therein results from the fraud, imposition and restraint of the person whose superior will prompts the execution of the testament in the particular manner which the testator adopts.' ''

The editor of Vol. 66, A. L. R., after citing and reviewing many of the decisions, states at page 228, their holding thus:

''It is the generally accepted view that the mere existence of confidential relations between a testator and a beneficiary under his will does not raise a presumption that the beneficiary has exercised undue influence over the testator, and does not cast upon the beneficiary the burden of disproving undue influence. Those consequences follow only when the beneficiary has been actively concerned in some way with the preparation or execution of the will.''

See to same effect *Brumbaugh v. Barber,* 135 Or. 392 (296 P. 42); *In Re Estate of Heaverne,* 118 Or. 308

(246 P. 720) ; *In Re Le Gault's Estate,* 99 Or. 621 (196 P. 254). Two recent decisions of an exhaustive nature are *Re Llewellyn,* 296 Pa. 74 (145 Atl. 810, 66 A. L. R. 222), and *Zeigler v. Coffin,* 219 Ala. 586 (123 So. 22, 63 A. L. R. 942).

■ From the above it is clear, therefore, that no presumption exists that the beneficiary exercised undue influence upon the testator, unless the evidence indicates that a confidential relationship existed between these two individuals, and that the beneficiary was actively concerned with the preparation of the will. We shall once more turn to the evidence.

Thelma was not sure whether she was the one who had telephoned to Pfouts, requesting him to come to the hospital on October 16. It is certain that when Anton selected Pfouts as his attorney in the summer of 1931 the selection was made by himself and not by Thelma. Thelma was present October 16 when Anton directed Pfouts to prepare the will and was present again on October 17 when the will was executed. Both she and Pfouts swore that on both occasions Thelma remained silent. Thelma testified that when Pfouts arrived on October 16 and Anton told him to prepare a will she was surprised to learn that her uncle had not previously made one. There is certainly no direct evidence that Thelma suggested to the testator that he make a will, nor that she suggested how he dispose of his property.

■ If we confine ourselves to the period prior to October 18 we have but very little evidence indicating that Anton ever entrusted to Thelma the transaction of any of his business. On two occasions he borrowed sums of money from her which he paid back with interest long prior to October 17, 1931. On October 17, as we have seen, he directed her, pursuant to Pfouts' advice,

to collect some promissory notes and a few days prior thereto he directed her to take out of his safety deposit box $500 and deliver it to Pfouts. In the meantime, she had the keys to the box. The evidence indicates that, apart from this cash, the only articles in the box were some insurance policies. After Anton left the hospital he visited his safety deposit box to take note of its contents. While he was in the hospital, as we have also seen, he did not depend upon Thelma to take care of his property but telephoned requests to his friend, Nepple. Nevertheless, it is true that Thelma was there, bringing him comfort and was undoubtedly, in part, the recipient of his affection. For a definition of the term "confidential relationship" we turn to *Zeigler v. Coffin,* 219 Ala. 586 (123 So. 22, 63 A. L. R. 942), from which we quote:

"Confidential relations exist 'wherever confidence is reposed and accepted, and the one has it in his power, in a secret manner, for his own advantage, to sacrifice those interests of the other which he is bound in honor and good conscience to protect. 1 Story, Eq. Jur., § 323. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another.' Coghill v. Kennedy, supra, pages 658, 659 of 119 Ala. (24 So. 468); Raney v. Raney, supra, page 34 of 216 Ala. (112 So. 316).''

This definition, like all others of the term which have come to our attention, is very broad and inclusive. Possibly they are intentionally so. In its above form, however, it is too inclusive to be of service unless its application is restrained by discretion. We assume that every testator has confidence in those to whom he makes a bequest or a devise, and in many of them he also, no doubt, reposes trust and reliance. For instance, his wife, especially if she has helped him create his

estate, has surely won his confidence, trust and reliance. In fact, all to whom a testator gives the larger bequests and devises invariably have won his confidence. If we place all of these in the confidential relation group, we are proceeding to defeat the will rather than to probate it. It is not unlikely that the wife, son, daughter and others in whom the testator has confidence will be in some manner concerned about the preparation of the will, especially if it is made in the course of an illness. Any inference of undue influence arbitrarily drawn from the circumstances mentioned in this paragraph would rarely be sustained by the facts themselves. The truth of the matter is, as was pointed out in *Waters v. Waters,* 222 Ill. 26 (78 N. E. 1, 113 Am. St. Rep. 359), and *Goodbar v. Lidikey,* 136 Ind. 1 (35 N. E. 691, 43 Am. St. Rep. 296), that bequests and devises to those in whom the testator has confidence and who have won his affection are more likely to be free from undue influence than bequests and devises to others.

In the following cases we find that the courts apply the doctrine of confidential relations with circumspection.

In *In Re Watkins,* 81 Vt. 24 (69 Atl. 144), the testator bequeathed his entire estate to his wife, who had helped him accumulate it, and who had managed his affairs at various times. The wife was in and out of the room while the will was being drafted, and was present when it was executed. Her husband was then upon his deathbed. The court recognized the rule with which we are now concerned, but refused to indulge in any presumption of undue influence. We quote the following from the decision:

"The case is clearly distinguishable from those above referred to. The disposition of the property was

not unnatural. The will was not prepared by the beneficiary. It was not made upon her initiative, nor through the instrumentality of one acting independently of the will of the testator. There was nothing suspicious in the selection of the witnesses, nor in the circumstances immediately surrounding the transaction. There was nothing unnatural in the attendance and care that the testator had during his illness. The testator's property and business affairs had not been in the hands of the beneficiary in a way that gave her knowledge of them not possessed by the testator. It is not urged, nor even suggested, that the relation of husband and wife is in itself a relation that calls for an application of the rule. There is certainly no analogy between this relation and that of guardian and ward. The latter relation is based upon a legal recognition of the weakness of one party and the authority of the other. The situation presented to the trial court was not one that the law regards with suspicion, and its refusal to apply the rule in question was correct.''

In *In Re Llewellyn,* 296 Pa. 78 (145 Atl. 810, 66 A. L. R. 222), a relationship of intimate friendship had existed between the testator and the beneficiary of his will, Swartley, for more than 35 years. Upon many occasions the two men had occupied the same living quarters, and were so doing at the time of the decedent's death. The two had been associated together in business for many years previously. The attorney who drafted the will was summoned by a telephone call from Swartley, made, however, at the request of the testator who was very ill. He was selected by the latter. The draft of the will was handed by the attorney to Swartley who subsequently delivered it to the testator. The subscribing witnesses were summoned by Swartley at the testator's request. The document was signed in the latter's presence. When the testator signed the will he also executed a letter of attorney in favor of Swartley. After the execution of the will Swartley, as before,

attended to occasional items of business for the testator. The will bequeathed the entire estate, valued at a million dollars, to Swartley, leaving nothing to the testator's relatives, who were his cousins. We quote from the decision the following:

"The will in favor of the best friend he ever had, and as devoted a friend as any one ever had, was not unnatural or to be condemned. While the gift was unusual, the lifelong intimate friendship was equally so, and it, being a credit to both, should not be held prejudicial to either."

The court attached importance to the fact that Swartley had not been consulted concerning the terms of the will. It held that the circumstances above mentioned created no presumption that undue influence had been employed by Swartley.

In *Moriarity v. Palmer*, 286 Ill. 96 (121 N. E. 219), the testator, who was 80 years of age, and who showed a breaking-down of his physical and mental powers, was living with his daughter when he made his will. At his request, she telephoned for the attorney who drafted the will, and she was in an adjacent room when the will was signed. The door between the two rooms was open at that time. The will left nothing to the son who was in another state at the time the will was executed. The court indulged in no presumption that undue influence had been exercised when it sustained the will.

In *In Re Will of Robert Carr*, 121 Or. 574 (256 P. 390), the testator, an aged man stricken with a serious illness, was taken by Mrs. Catherine Ryan into her home where he was given care until death overtook him. While domiciled at Mrs. Ryan's home, an attorney was summoned and he prepared a will for Carr in which a substantial bequest was made to Mrs. Ryan and another

member of her family. The rule of confidential relations was not mentioned in the decision, but it was pointed out that "It is not enough to show that the parties accused had an opportunity to exercise influence * * *. Friendly advice or influence arising from gratitude, affection or esteem is not undue influence, nor can it become such unless it destroys the free agency of the testator at the time the instrument is executed."

In the instances above reviewed the relationship between the testator and the beneficiary was personal. It was based upon esteem, gratitude, or affection, arising out of friendship, kinship or marriage. It was not based upon contractual or legal duties. The occasional item of business which the one transacted for the other was incidental, and in the nature of a favor. The influence that the beneficiary had with the other was not based upon any secret information which he had gained through the relationship, nor through superior position. The bequests or devises under the circumstances were natural ones, and there was nothing about the making or the execution of the wills that excited suspicion. Under these circumstances the courts did not invoke the doctrine of confidential relations, and thus bring to the avail of the contestants a presumption that undue influence had been employed. In our present case Thelma's relationship to Anton was a personal one. The occasional item of business which she transacted for him was in the nature of a favor. In fact, she never charged for any of the services which she performed for her uncle. There is nothing about the incidents that occurred on October 16 and 17 that arouse suspicion, and the provisions of the will are natural. She possessed no advantage arising out of money, property or legal power over him. She had

knowledge of no secret information concerning him. The only influences that exerted themselves at the time of the making and execution of the will were gratitude and affection. But, before closing this matter, let us examine the charges still further.

■ The petition, as will be recalled, charges that the defendant, in order to consummate her alleged scheme to have her uncle make a will in her favor, sent for her father, and, after his arrival, used him as a confederate. This charge is supported by virtually no evidence. It is true that Knud came to Portland the day before the will was signed, visited Anton that evening, was present when the will was executed, and remained for two days thereafter. As a witness, Knud, who was four years younger than Anton, protested stoutly that he had no influence over his brother. The evidence indicates that this statement is true. He testified repeatedly that before Anton signed his will he had never spoken to him upon the subject of wills. There is no reason for disbelieving this declaration. The lack of truth of the aforementioned charge is clearly indicated by the fact that the day of the funeral service, according to testimony of one of the contestants, he stated that he deemed the will unfair. As a witness, Knud testified: "I wished that he (Anton) would have remembered some of these Rudes here that was in need of something." But added that the will "was his (Anton's) wish and his idea; that was all there was to it; you couldn't turn him, you know. I didn't have no influence over him whatsoever." Knud's wife (Thelma's stepmother) was called as a witness for the contestants, and apparently was not favorably disposed toward Thelma. We dismiss the charge of confederacy as entirely unfounded.

■ The contestants argue that the signing of the will

was attended with secrecy contrived by Thelma. This contention is based largely upon the circumstance that when Pfouts entered Anton's hospital room on October 17 the defendant requested Mrs. Knudson and Glasscock to retire to the hall "because there was going to be some business transacted". Mrs. Knudson was almost a stranger to the testator, and Glasscock was not related to him, although he was the husband of one of the testator's nieces. These two had no claim upon the testator's bounty and we cannot understand how a request for their retirement can be subject to criticism. There still remained in the room Pfouts, the attorney whom the testator had selected, Nelson, the hospital superintendent, who was Anton's friend, and Anton's brother. The secrecy contention is based further upon the facts that Thelma did not thereafter mention the will to the contestants and that when Glasscock inquired of Knud whether one had been made a negative answer was given. Knud claimed that Glasscock made the inquiry before the will was executed. However, Glasscock's inquisitiveness was not yet satisfied and upon repeating the inquiry to some of Anton's old-time friends he was told that a will had been executed. This charge is further founded upon the testimony of one of the contestants who swore that a day or two before the will was signed Thelma asked him to remain away from the hospital on October 17 because some business was to be transacted. This testimony was contradicted and it is altogether likely that the individual's recollection may have been at fault. We fail to find that this charge is supported by proof.

■ We do not believe that the evidence warrants a conclusion that a confidential relationship existed between the testator and the beneficiary of his will, nor that the latter so concerned herself about the prepara-

tion of the will as to demand explanation. As previously pointed out, the will was a natural one and the circumstances of its execution are free from suspicion. Therefore, there exists no presumption that Thelma exercised undue influence.

■ We come to a consideration of the charge that Thelma simulated affection and employed it for the purpose of subjecting the mind of the testator to her directions. No witness testified to any remark made by Thelma or any act done by her which even remotely indicates that her attitude towards Anton was not the result of genuine fondness for him. The contestants saw a great deal of Thelma during the last seven months of the testator's life, and therefore had an opportunity to observe anything which would indicate simulation. From about the middle of October to the latter part of November while she was spending her nights in Anton's hospital room she went to the Glasscock's home every morning for breakfast and slept there for a few hours to obtain needed rest. Mr. Glasscock drove her back and forth from the hospital each day. As we have seen, three or four of the contestants testified that they called frequently at the hospital and one of them nursed Anton for two days during Thelma's absence on a trip to Seattle. After Anton returned to his home in January, 1932, some of the contestants visited him frequently and one of them nursed him during his last two weeks of life. While the husband of one of the contestants testified that Thelma did not seem to welcome his visits to the hospital room, Mrs. Glasscock testified that Thelma was always "very pleasant". Thus, the contestants had numerous opportunities to detect any simulation upon her part. In addition, Thelma wrote several letters to Mrs. Zwick, a friend of the testator, to whom we have already re-

ferred. Had Thelma done anything or had she uttered any word which indicated that her attention was not prompted by affection, we are sure that it would have come to the attention of one of the contestants, and that it would have been mentioned during the course of the trial. No such testimony was, however, given. We are convinced that Thelma's interest was prompted by genuine affection. The charge that she represented to Anton that the contestants had no interest in him is supported by such flimsy testimony that we shall not pause to set forth the occasional remark upon which the charge is apparently based. It will suffice to state that, in our belief, she made no representations adverse to the contestants.

The above disposes of every specific contention alleged by the contestants. It is our belief that the beneficiary employed no deception and that the devoted attention which she bestowed upon her uncle was not prompted by a purpose to gain control over him and, in that manner, procure a will in her favor. From *In Re Sturtevant's Estate,* 92 Or. 269 (178 P. 192, 180 P. 595), we quote: "Kind treatment and even reasonable solicitation do not constitute undue influence." In *Kischman v. Scott,* 166 Mo. 214 (65 S. W. 1031), the facts were that a niece had lived ever since childhood in close association with her uncle, the decedent. In later years she nursed him during periods of illness; and when his faculties began to decline she went with him when he transacted business. We quote from the decision:

"Mrs. Scott had been the protege of the testator, who was wifeless and childless, since her infancy; she was the child of a dead sister, who left her to her uncle to raise, when she was only about two years old. After she grew to be large enough she lived in his house, nursed him, cared for him and ministered to his wants as if she were his own child. As was said in

note to Small v. Small, 16 Am. Dec. 259: 'Influence gained by kindness and affection will not be regarded as undue, if no imposition or fraud be practiced, even though it induced the testator to make an unequal and unjust disposition of his property in favor of those who have contributed to his comfort and ministered to his wants, if such disposition is voluntarily made.' (In Re Gleespin's Will, 26 N. J. Eq. 523). Again, in Mackall v. Mackall, 135 U. S. 167, it is said: 'It would be a great reproach to the law if, in its jealous watchfulness over the freedom of testamentary disposition, it would deprive age and infirmity of the kindly ministrations of affection, or of the power of rewarding those who bestow them.' (Campbell v. Carlisle, 162 Mo. 634.) Nor were there any such relations existing between the testator and the devisees in the will as to cast upon the latter the burden of showing that the will was executed without undue influence upon her part.''

The above disposes of every contention of the contestants adversely to them.

The decree of the circuit court is affirmed.

CAMPBELL, C. J., and KELLY and BELT, JJ., concur.