Argued March 27, affirmed April 16, 1952

DAVIS, Executor *v.* HURLBURT et ux.

242 P. 2d 781

*L. L. Ray* argued the cause for appellants. On the briefs were Ray and Pennington, of Eugene.

*William Huey* and *Frank B. Reid,* of Eugene, argued the cause and filed a brief for respondent.

Before HAY, Acting Chief Justice, and ROSSMAN, LUSK, WARNER and TOOZE, Justices.

WARNER, J.

This is a suit for the cancellation of a deed given by J. S. Warwick, the original plaintiff, to the defendants, Ray W. Hurlburt and Esther Hurlburt, his wife. From a decree adverse to the defendants, they appeal. Subsequent to the commencement of this appeal, J. S. Warwick died and U. Grant Davis, as executor of his estate, was substituted in his stead. Our use of the word "plaintiff" hereinafter will refer to the decedent.

Plaintiff's complaint, as observed by the lower court, is far from being a model of perfection. However, it alleges a cause of suit, although very imperfectly stated. The complaint, among other things, sets forth the plaintiff's advanced age and infirmities of body and hearing. It also avers that on the 14th day of August, 1950, the defendants falsely and fraudulently represented that they would pay plaintiff the

sum of $6,000 for his parcel of land in Eugene on the day following the delivery of the deed to them, and that defendants further represented that if he would deliver the deed to them, they would not record it until they had paid the full sum of $6,000.

The deed was prepared and executed in the office of the Title Abstract Company of Eugene. It was there acknowledged by Mr. Warwick before Alice Olmstead, a notary public and employee of the title company. The conveyance was then left in that office pending the receipt of the purchase price. No escrow instructions were given. The complaint also alleges that thereafter and without the knowledge or consent of plaintiff and without payment of any part of the purchase price, the defendants obtained the deed from the title company and caused it to be recorded on August 29, 1950.

The defendants assert that the agreed purchase price was $3,000; that Mrs. Hurlburt paid that amount in full to plaintiff in currency in the office of the title company on August 14, 1950, at the same time all the parties were there to get the deed and have it executed by the plaintiff grantor.

The record presents but one question for inquiry here: Did the plaintiff receive any consideration for his deed? The amount of the purchase price agreed upon is a matter of no importance, if we find an absolute failure on the part of the defendants to pay any consideration whatsoever.

"Mere want or failure of consideration, whether partial or total in character, when unmingled with fraud, accident, or mistake, is not sufficient in equity to obtain the rescission of an executed contract * * *. If, however, a person has been induced to part with a thing of value for little or no consideration, chancery will seize upon the slightest cir-

cumstance of oppression, fraud, or duress for the purpose of administering justice in the case in hand * * * ''

9 Am Jur, Cancelation of Instruments, 370, § 24.

The ultimate conclusion depends primarily upon whether the testimony given by the plaintiff reflecting his version of the transaction is more convincing than the testimony adduced by the defendants as witnesses in their own behalf. The event commanding our greatest interest is the transaction occurring in the office of the title company on August 14. In corroboration of his story, the plaintiff called two employees of the title company. In partial support of their representations, the defendants depended upon their children, Lucile and Odell. Lucile is 12 years old. The record does not reveal the age of their young son.

Mr. Warwick had been a resident of Lane county for many years and was 90 years old at the time of the deal which occasioned this suit. He was especially feeble at the time of trial in February, 1951. Shortly before the real estate deal between the parties in August, 1950, Mr. Warwick, because of his age and a physical infirmity, found that he could no longer live alone and was in need of a place where he could secure board and room. This necessitous situation prompted him to make an arrangement about August 1, 1950, with the Hurlburts, whom he had long known. At that time it was agreed that he would make his home with them at their place about four miles out of Eugene and pay $50 per month for board and room. He paid $50 in advance for these accommodations for the month of August. Shortly after Mr. Warwick began to make his residence with the Hurlburts, they opened negotiations with him for the purchase of his

property. According to Mr. Warwick, he finally agreed to sell for $6,000 cash. According to the Hurlburts, the price was $3,000.

Mr. U. Grant Davis is a man 85 years old. He lives in Eugene and is employed in a local drugstore. Davis is the same person who is presently the executor of Mr. Warwick's estate. He was not only Mr. Warwick's brother-in-law but also had been an intimate friend for 50 or 60 years. Mr. Warwick had made him a confidant and adviser in his business matters. Davis was the one to whom Mr. Warwick went for assistance whenever he had any banking business. Davis testified that before the Hurlburts closed their deal with plaintiff, Mr. Hurlburt came to him at the drugstore and advised him that he was planning to buy the Warwick place for his daughter. In response to a question concerning what was said about the price, Davis answered: "Well, he [Hurlburt] asked me what I thought the price was. Joe [meaning plaintiff] asked him $6,000. And he asked me what I thought it was worth, and I told him it was worth about $5,500.00." In evaluating the testimony of this witness, the trial judge observed in his opinion that notwithstanding Davis' advanced years, "he is physically well and mentally keen * * *."

The physical structure and lay of that part of the title company office where the parties convened on August 14 were viewed by the circuit judge. It has a marked relationship to the visibility of the actions of the parties while on those premises. Mrs. Hurlburt says it was the place where she paid the consideration. We take the following description from Judge Skipworth's opinion:

"The waiting room in the abstract office is a very small affair. There is a counter extending

across the front of the room. The entrance door from the street is on the left end of the counter. On the right is an opening from the small, outer office into the business office. In the little waiting room there is a radiator and two chairs.''

Mrs. Hurlburt testified that while in this small and exposed space in the title company office, she and Mr. Warwick occupied the two chairs referred to. While sitting next to plaintiff and while Mr. Hurlburt and his daughter, Lucile, stood at the office counter, Mrs. Hurlburt claims she counted out on plaintiff's knee $3,000 in currency. This consisted of twenty $100 bills and fifty $20 bills. This, she said, took ''about twenty minutes.'' According to her, Mr. Warwick put some of the money in his pocket and some in his wallet. Plaintiff denied that he received any money then or later. The two women employees of the title company who waited upon the Hurlburts and Mr. Warwick while they were in the office say they saw no money transferred by Mrs. Hurlburt or anyone else to plaintiff.

The defendants contend that each contributed $1,500 to the purchase price. This, they tell us, came from their respective cash reserves kept at hand in the Hurlburt home. They also assert that on the evening of August 13, they prepared for closing their deal with plaintiff the next day and to that end had counted out the $3,000 on their kitchen table in the presence of their two young children. The youngsters testified that they saw their parents counting some money at that time. The daughter, Lucile, was with her parents in the title office the next day. Concerning what transpired then, Lucile is not too informative nor persuasive. On cross-examination she confesses that ''* * * I didn't pay much attention * * *'' and

when pressed to state if she could hear her mother when she counted out the money to plaintiff, Lucile responded, "Well, I don't quite remember."

We think it is a matter of no little significance that at the time of and long before the Warwick-Hurlburt deal took place, Mrs. Hurlburt maintained a checking account in the Eugene branch of the United States National Bank of Portland. She also had a savings account in the Eugene branch of the First National Bank of Portland. Yet, we are told that the $3,000 allegedly paid to Mr. Warwick was a part of two substantial funds of currency which the defendants separately conserved in the Hurlburt home. We note, too, that the day after the deed was recorded, Mrs. Hurlburt drew a check upon her United States National Bank account in favor of the city of Eugene in the amount of $160. This was delivered by Mr. Hurlburt in full payment of a sewer assessment against the Warwick property shown by the title report.

Mrs. Hurlburt claims that her half of the cash contribution to the purchase price came from funds which she withdrew from her savings account on December 11, 1949, and which she kept in her home for approximately nine months afterward. She also testified that in the meantime she had acquired two or three other pieces of real property, using, as we understand, a portion of the funds withdrawn from her savings account.

Her husband is extremely vague as to the source of the $1,500 cash which he claims he advanced on the purchase price. Hurlburt maintains that it represented the proceeds from sales of his logging equipment to three different persons. He is unable, however, to remember the names of the persons to whom he made the sales. His explanation as to his cash contribution

to the alleged purchase price and their reasons for using cash instead of giving Mr. Warwick a check are as unsatisfactory as those of his wife.

The plaintiff, on the other hand, was in the habit of keeping all his money in the bank. He then had a substantial deposit in the First National Bank in Eugene. The testimony of Mr. Davis supports the conclusion that Mr. Warwick was not in the habit of carrying large amounts of money on his person but deposited them in the Eugene bank, ofttimes with the assistance of Mr. Davis.

The recited consideration in the deed was $10. Revenue stamps in the amount of $1.10 were attached, indicating a real consideration of only $1,000. Although no one gives a clear explanation when or by whom they were attached, we are convinced that Mr. Warwick had nothing to do with affixing the revenue stamps to the deed. We think it was done by the Hurlburts or by someone under their direction. The explanation given by the Hurlburts for the use of revenue stamps in an amount short of legal requirement is far from satisfactory. The stamps attached bear the initials ''J.S.W.'' in cancellation, but a comparison of this writing with Mr. Warwick's signature on the deed is convincing that he is not the person who initialed them.

The purpose in going to the office of the title company was not only to have a deed prepared but also to secure a title report for the benefit of the Hurlburts. This title report, we are told, disclosed the presence of the unpaid sewer lien. This lien was later paid by the Hurlburts with the check drawn by Mrs. Hurlburt above referred to. It seems strange to us if the defendants were cautious enough to secure

a title report on plaintiff's property, that they did not, coincident with learning of the sewer lien, withhold from the alleged purchase price of $3,000 an amount sufficient to pay that lien. If we accept the Hurlburt version of what transpired in the title company office, we must believe that notwithstanding that they there learned of the sewer lien encumbrance, they parted with the entire purchase price without even inquiring as to the amount of the lien and deducting it from the $3,000. The record assures us that the defendants were not strangers to the usual ways of doing business. Mrs. Hurlburt had shortly before acquired a couple of parcels of land near Noti, Oregon. Mr. Hurlburt testified as to other ownerships.

In our opinion, one of the most unusual circumstances in this transaction is that while Mr. Hurlburt was standing and Mr. Warwick and Mrs. Hurlburt were sitting in the relatively small space available to them for that purpose in the title company office and while thus exposed to the presence of everyone who, was working in that office at that time, not one person in the employ of the title company recalls having seen the cash transaction testified to by the defendants and by Mrs. Hurlburt said to have taken nearly 20 minutes of her time as she sat there counting out 70 pieces of currency on Mr. Warwick's knee. No employees of the title company dealing either with Mr. Hurlburt at the counter or taking Mr. Warwick's acknowledgment testified that they saw the plaintiff receive any money while in the office, nor did they see Mrs. Hurlburt count any funds.

■ While age or physical and mental infirmity does not of itself show that the deed of a grantor suffering therefrom was the product of undue influence or fraud, such matters arouse the suspicions of equity and,

where found in conjunction with other factors indicating imposition, may show undue influence or fraud. 26 CJS, Deeds, 294, § 62.

Mr. Warwick was a very old man, deaf and suffering from bodily infirmities. His state of health rendered him unable to care for himself without the assistance of others. The defendants had known him for many years. It was the defendants who took him into their home and within a few days thereafter it was the defendants who were in a deal to buy his property. They are the ones who took him to the title company. It was the defendants who dictated the preparation of the deed, ordered the title report and arranged for the insufficient revenue stamps. We think that the record warrants the assertion that the defendants were the ones who made it impossible for Mr. Warwick to consult with his old friend and business counselor, Mr. Davis, before "closing" their deal. Mr. Hurlburt, at least, knew full well that if they did take plaintiff to Davis before getting a deed, Davis would advise Mr. Warwick against selling his property for $3,000, a property which the uncontradicted testimany shows was then earning a gross rental of $90 per month and which Davis testified was worth not less than $5,500.

The defendants sustained a confidential relationship to plaintiff. *Ramstead v. Bridges,* 175 Or 182, 189, 152 P2d 306; *In re Knutson's Will,* 149 Or 467, 41 P2d 793; 15 CJS 821. Where such a relationship exists, the burden rests upon the dominant confidant, in this case the defendants, to exercise the utmost good faith and show the fairness of the transaction. When such a confidential relationship exists, equity will scrupulously examine any transaction between the parties and set it aside, if there is an unfair advantage in favor

of the person in whom confidance was reposed. 17 CJS, Contracts, 478, § 132.

The learned trial judge in his opinion very wisely and correctly stated that his decision was a difficult one to make. Our own perusal of the record confirms the aptness of this observation, but what proved difficult for him has been doubly difficult for us. He saw and heard the witnesses. He had the opportunity to observe their demeanor upon the stand. We have nothing but the cold record.

■ The demeanor of a witness on the stand comprehends so many things which only the eyes and ears of the trial judge can capture and evaluate. There are items of testimony which all the diligence and devices of the reporter can never translate to paper record. It is these ephemeral nuances, unseen and unheard by us, which not infrequently and very justly become the determinative factors in the lower court's final decision. This is obviously such a case. Taking the record as a whole, it is a most outstanding example of a suit which justifies, if not mandates, that we place great dependence upon the trial judge's 37 years of full and rich judicial experience. In so doing, we are confident that, difficult as his decision was, it is none the less equitable and just.

The decree is affirmed but without costs or disbursements to either party.